ARTEMISA BUDD *vs.* WALTER T. BROOKE, ET AL. LESSEE.— *December* 1845.

Where an objection is made to the admissibility of evidence in mass, without specification, if any part of it is admissible for the purpose for which it was offered, it is not error in the court to overrule the objection.

Where an entire prayer is good in part, and bad in part, the court is not bound to perform the duty of counsel, analyze the subject matter of the prayer, admit a part, and reject the residue; but may content itself, in granting, or rejecting the same, according to its merits, as presented in its entirety.

A tract of land described in the patent, as lying on the south side of a creek called *C* creek, beginning at a marked white oak, standing on the west side of a little creek called *St. K's* creek, and running *E. N. E.* up *C* for breadth, the length of, &c., to a marked oak, would not by force of the terms, *"running E. N. E. up the creek,"* bind on the creek, for they merely indicate the general direction of the line referred to, and the line must be run from boundary to boundary.

But where the patent further described the land, which was a tract of four sides, by stating how it was bounded on the *E. S. and W.*, and that it was bounded on the *N.* (where its first line runs,) with *C* creek, this controls the location of the first line, and requires it also to bind on the creek.

It is of no moment in what part of a patent a binding expression is found, wherever found it must be applied according to its true meaning.

In giving construction to a patent, the court is bound, as far as possible, to reconcile all its parts, and gratify the full meaning and import of every word.

The course of a line is in no case held to interpose any obstacle to the gratification of a conflicting binding call.

Deeds are to be most strongly construed against the grantor, for the benefit of the grantee.

When a tract of land called to begin at a marked tree, thence running up and with a creek two hundred perches, to another marked tree, it should be

located to run from the beginning tree, so as to bind on the creek, to the second boundary; but if that boundary cannot be found on the creek, a line may be supplied, from the end of the two hundred perches on and with the creek, to the second boundary. It would be against our practice to supply a line from such second boundary to the nearest point on the creek,

The patent for *W* described it as lying on the *S.* side of a creek, beginning at a marked oak by the creek side, and running *S. W.* down the creek for breadth, the length of one hundred perches to a marked oak, standing upon a point at the mouth of the said creek; bounding on the *S.* by a line, &c. drawn *S. E.* into the woods three hundred and twenty perches, to a bounded oak; on the *E.* by a line, &c. drawn *N. E.* from the end of the former line to a bounded hickory, that intersects a parrallel line drawn *N. W.*, to the first marked oak on the *N.*, with the said parrallel on the *W.* with the said creek. HELD :

The first line of *W* binds on the creek.

The second boundary of *W* being lost, and the spot where it stood being incapable of identification, if the creek had not been called for, the first line must be run from the beginning by its course and distance, the best means left of ascertaining its true location and terminus.

The description, "standing upon a point at the mouth of a creek," is too vague and indefinite to control the positive expressions of the patent as to course and distance; and is not of itself sufficient evidence of its locality.

Certainty is the controlling object in all locations.

A binding call for a creek, and also for a marked tree having relation to a line of a tract of land, changes the general rule, that the line calling for a lost boundary must be run by course and distance.

Where there are two imperative calls, both, if practicable, must be gratified.

Where there were two calls, one for a line to bind on a creek, and the other to terminate at a marked tree, if the latter cannot be found, nor its spot identified, the distance must be expended on the creek, and no interpolated line can be supplied.

Proof that a point shown on the plots was the outermost and most prominent point at the mouth of the creek, and the first point reached in running the first line of *W*, with a general description of such point, is not evidence tending to prove that the marked oak once stood there.

If for any reason, no matter whether it be for the reason assigned or not, the testimony objected to, be inadmissible for the purpose for which it is offered, it should be rejected by the court.

The variation of the compass has no application to a line which must be run according to the calls in the patent, which are to be gratified in the same manner, as if no course for the line were expressed in the patent.

Where defence is taken on warrant of resurvey, an ancient plot, to be given in evidence, must be correctly located under the warrant, upon the plots prepared for the trial of the cause. Where it is so unintelligibly represented upon such plots and the explanations, as that it was almost impossible for either the court or jury to say whether the locations on the plot

offered in evidence, were truly located on the plots in the cause or not, such ancient plot cannot be used as proof.

In ejectment, the plaintiff declared for a tract of land called *"Nonesuch,"* and professed to locate it according to its patent. There was no location of it as a parcel of land, made up of other tracts, which had acquired a name by reputation; under such circumstances the plaintiff would not be permitted to prove, that *"Nonesuch"* was known by its reputed name as comprising such other parcels, though these were located, for the defendant could not have had any opportunity to counterlocate it by its acquired or reputed character.

Whether lands may be declared for, or recovered by their reputed name, *qr.*

To render an exemplified copy of a deed admissible in evidence, to prove title to the land which the deed professed to convey, it must appear to have been executed with all the essential forms required to warrant its enrolment under the laws of this State.

In 1684, the law required that such a deed should be acknowledged before some of the judicial tribunals or public officers, enumerated in the acts of Assembly, and recorded within one year.

The recording of a deed not authorised by act of Assembly, gives it no additional validity, and the record thus made, or the exemplified copy therefrom, is no more evidence of the existence of the deed, than would be a copy of such deed certified by any private individual.

None of the various acts prescribing the mode in which conveyances of land are to be made, direct the certificate of the acknowledgment of a deed to be recorded, except that of the acknowledgment of a *feme covert;* yet it has been a uniform custom of all recording officers, to record such acknowledgments, and their authentications of such recording, have, in all the tribunals of the State, been received as sufficient evidence of such acknowledgements.

The acts of 1692, ch. 30; 1699, ch. 42; and 1715, ch. 39; only cured such defective conveyances as had been recorded within the year.

Where a deed professes to convey part of a parcel of land, called *A,* and in giving its description by course and distance, it has but two straight lines, which can embrace no deed nor any part of a tract, it is not evidence of title or location.

The time of recording a deed, is sometimes a matter to be determined by the court, sometimes a question to be submitted to the finding of a jury.

If it plainly appears from the endorsement, officially made upon a deed or its exemplification, that it has *not* been recorded within the time prescribed by law; and there is no admissible evidence in contravention of such endorsement, then the admissibility of the deed or its exemplification, in evidence, is determined by the court; but if there be such admissible contravening testimony legally sufficient, then the time of recording, with a hypothetical instruction from the court, will be submitted to the jury.

Where it did not appear by any endorsements on the exemplification of a deed, which had been recorded, whether it had been so recorded in or out of time, it is for the jury to determine whether it was recorded in time,

and the court, without any proof upon the point, cannot conclude it was in time.

An exemplified copy of a will, made in another State, admitted to *probat* there, and certified from the records of such State, devising lands in *Maryland*, is not evidence of title in the devisee here.

Of wills of land in *Maryland*, our own courts only, are authorised to take *probat*.

The court will not direct the jury to presume conveyances to a party or his heirs, where the proof of possession, on which the presumption is founded, is not clear and sufficient, both as to the character of the possession, and its duration.

In construing a grant, it is the duty of the court, first, to ascertain what the parties intended should be effected by it.

That intention being collected from an inspection of the grant itself, it is the duty of the court to give it such an interpretation as will effectuate it, provided the terms and expressions used in the grant, will admit of such a construction.

Where a patent recited that *S*, on behalf of herself and *W* and *R*, infants, by her petition set forth, that *T*, her deceased husband, did theretofore set forth, by his petition, that there was escheat, &c., and being the first discoverer, prayed to be admitted to its purchase, &c., and paid for the same; but, before the said *T* obtained a grant, he died, having devised the aforesaid escheat land to his wife, *S*, during widowhood, and afterwards, to be equally divided between *W* and *R*, and she prayed that a grant might issue, agreeably to the bequest of the said *T*, which was granted to *S*, *W* and *R*, to have and to hold unto the said *S*, *W* and *R*, their heirs and assigns forever. Held : that the *habendum* in the patent, should not control its premises, which was to vest in the grantees the same estate which they respectively would have taken under the will of *T*.

The technical meaning of the word premises, in a deed of conveyance, is everything which precedes the *habendum*, and it is in the premises of a deed that the thing is really granted.

The limitation contained in the *habendum* of a deed, where it is in conflict with the estate given in the premises, must be rejected, and that in the premises prevail.

A grantor shall not be allowed to contradict or retract, by any subsequent part of a deed, the gift made in the premises.

The refusal of a prayer, which ought not to have been granted, though made upon erroneous constructions of the evidence, is not error in the county court.

Appeal from *Charles* county court.

This was an action of *Ejectment* brought on the 15th May 1838, by the appellees against the appellant. The plaintiffs declared for nineteen undivided twentieth parts of a tract of land called "*Nonesuch*," beginning at a bounded hickory

standing on the south side of *Chickamuxan* creek, the original boundary of *Nonesuch,* and running thence with the lines of the tract of land called "*Nonesuch,*" corrected from the original grant of *Nonesuch* to the year 1800; south sixty-four degrees forty-two minutes west, forty perches; then north fifty-one degrees forty-eight minutes west, eight perches to *Chicka-muxan* creek; then down and with said creek to *Potomac* river; then down and with said river to a free stone, the upper corner of *Fletcher's Addition;* then leaving the river and running with the lines of *Nonesuch,* south forty-seven degrees forty-eight minutes east, one hundred and twenty-five perches; then north seventy-five degrees fifty-seven minutes east, one hundred and thirty-six perches; then with the dividing line between the said tract and part of the said tract retained by *Richard Brooke,* north eight degrees east, one hundred and thirty-four perches; then with a straight line to the beginning, containing, &c.

To this declaration a certain *William Budd* appeared, &c., pleaded not guilty, and took defence upon warrant of resurvey, which was accordingly issued. His death being afterwards suggested, his devisee, the present appellant, appeared to defend the action, &c. The jury found a verdict for the plaintiff.

1st EXCEPTION. At the trial of this cause, the plaintiff, to support the issue on his part, read in evidence the patent of *Allanson's Folly, Wicksall,* and *Aspinal's Hope,* the plats and explanations of plaintiff's locations filed in this cause, viz :

"Grant to *Thomas Allanson* for 400 acres in *Piscataway* river. *Allanson's Folly. Cæcilius, &c:*—Know ye, that we do hereby grant unto the said *Thomas Allanson* a parcel of land called "*Allanson's Folly,*" lying on the east side of *Pis-cataway* river, on the south side of a creek in the said river called "*Chincomuxen* creek," beginning at a marked white oak, standing on the west side of a little creek called "*St. Katha-rine's* creek," and running east-north-east up *Chincomuxen* for breadth the length of two hundred perches to a marked oak, standing by a marsh side against a hammock of trees that standeth in the marsh, bounded on the east with a line drawn

south-east from the said oak, into the woods for the length of three hundred and twenty perches to a marked oak; on the south with a line drawn south-west from the end of the former line until it intersect a parallel line drawn from the first marked oak at *Saint Katharine's* creek; on the west with the said parallel; on the north with *Chincomuxen*, containing, &c. Given at *St. Mary's*, under our great seal of our said province of *Maryland*, this 23rd day of June, in the 32nd year of our dominion over our said province of *Maryland*, Anno Domini 1663. Witness, &c."

"*John Hichinson*—patent—200 acres. *Wicksall. Cæcilius, &c.* To all persons to whom, &c:—Know ye, that we do hereby grant unto him, the said *John Hichinson*, a parcel of land called "*Wicksall*," lying in *Charles* county, on the south side of *St. Michael's* creek, formerly called "*Chickamuxon*" Beginning at a marked oak, by the creek side, being the bounded tree of the land formerly laid out for the said *Allanson*, called "*Allanson's Folly*," and running south-west down the creek, for breadth the length of one hundred perches, to a marked oak standing upon a point at the mouth of the said creek, bounding on the south by a line drawn south east, into the woods, the length of three hundred and twenty perches to a bounded oak; on the east by a line drawn north-east from the end of the former line, the length of one hundred perches to a bounded hickory that intersects a parallel line drawn north-west, to the first marked oak on the north, with the said parallel on the west with the said creek, containing and now laid out for two hundred acres, more or less, benefits thereunto belonging, *Royal Mines* excepted. To have and to hold the same unto him, the said *John Hitchinson*, his heirs and assigns forever, to be holden of us and our heirs, as of our manor of *Pangaya*, in free and common soccage, by fealty only for all manner of services, yielding and paying therefor, yearly, unto us and our heirs, at our receipt at *St. Mary's*, at the two most usual feasts in the year, viz: at the feast of the Annunciation of the *Blessed Virgin Mary*, and the feast of *St. Michael*, the Arch-Angel, by even and equal portions, the rent of four shillings sterling, in silver or gold, and for a fine upon every

alienation of the said land, or any part or parcel thereof, one whole year's rent in silver or gold, or the full value thereof in such commodities as we and our heirs, or such officer or officers appointed by us or our heirs from time to time, to collect and receive the same, shall accept in discharge thereof, at the choice of us and our heirs, or such officer or officers as aforesaid; provided, that if the said *John Hichinson,* his heirs or assigns, shall not pay unto us or our heirs, or such officer or officers as aforesaid, the said sum, for a fine before such alienation, and enter the said alienation upon record, either in the provincial court or in the county court, where the said parcel of land lieth, within, &c. Given at the five and twentieth day of November, in the six and thirtieth year of our dominion over our said province of *Maryland,* A. D. 1667. Witness, &c."

"*Henry Aspinall*—patent—150 acres. *Aspinall's Hope. Charles, &c.* To all persons:—Know ye, that we do hereby grant unto him, the said *Henry Aspinall,* all that tract or parcel of land called "*Aspinall's Hope,*" lying in *Charles* county, and beginning at a bounded oak, bound tree of a parcel of land called "*Wicksall,*" standing on the south side of *Chickamuxon* creek, on a point at the mouth of the said creek; running thence south-south-west eighty perches; thence south by east forty perches to a bounded chesnut oak; thence binding upon *Fletcher's Addition,* south-east one hundred and twenty-five perches to a bounded red oak; thence east and by north one hundred and ten perches to an oak in the line of "*Wicksall;*" thence binding on "*Wicksall,* to the first bound tree, containing, &c. Given at our city of *St. Mary's,* &c., this 16th of March, in the seventh year of our dominion over our said province, &c., Anno Domini 1681, &c. Witness our self."

The plaintiff located a plat made out by *Theophilus Hanson,* in an ejectment where *Walter Brooke's* lessee, was plaintiff, and *James Davis* was defendant, which original plat is endorsed, "filed 23rd October 1789," and which is herewith returned; all the locations made on said original plat are copied on the present plat in this case.

The plaintiff locates *Allansons Folly* according to the patent thereof, beginning at A, &c.

The plaintiff locates *Nonesuch* by the patent thereof, beginning at C, a locust, &c.

The plaintiff locates for his pretensions, a deed from *Walter T. Brooke* and *Richard Brooke* to *Lott Mason*, dated 2nd of October 1824, beginning at C, the beginning of *Nonesuch*, and running thence, &c.

The plaintiff then read in evidence the various plots, surveys and explanations of the surveyor, under the warrant in this cause, as made by directions of both parties, and which are sufficiently stated in the opinion of this court; and then, for the purpose of establishing the beginning of *Allanson's Folly*, at black A, marked on the plats in this cause, offered to give in evidence, by *James Brawner, Esq.*, a competent witness, that in the survey made prior and preparatory to the execution of the deed of *Richard Brooke*, and *Walter T. Brooke*, to *Lott Mason* in 1824, for a part of that tract or parcel of land called *Nonesuch*, beginning at a bounded hickory, standing on the south side of *Chickamuxon* creek, the original beginning boundary of *Nonesuch*, and running thence with the lines of the tract of land called "*Nonesuch*," corrected from the original grant of *Nonesuch* to the year 1800; south sixty-four degrees forty-two minutes west, forty perches; then north fifty-one degrees forty-eight minutes west, eight perches to *Chickamuxon* creek; then down and with said creek to *Potomac* river; then down and with said river to a free stone, the upper corner of *Fletcher's Addition;* then leaving the river and running with the lines of *Nonesuch*, south forty-seven degrees forty-eight minutes east, one hundred and twenty-five perches; then north seventy-five degrees fifty-seven minutes east, one hundred and thirty-six perches; then with the dividing line between the said tract and part of the said tract retained by *Richard Brooke*, north eight degrees east, one hundred and thirty-four perches; then with a straight line to the beginning, &c.

The first line of said deed, as then run in the presence of said *Lott Mason* and *Richard Brooke*, stopped at or near the point A, and the beginning of said deed was found at the point black C on the plats; that the said lines of said deed, as then

run in 1824, do correspond with the lines of said deed, as surveyed and located by the plaintiff on the plats in this cause, and that on the survey made in this cause, the said first line of said deed to *Lott Mason*, did terminate at black A, as located on the plats of this cause, and was run with the usual allowance for variation, from the date of said survey, in 1824.

And the said plaintiff accompanied said offered evidence with an offer of further evidence, to prove, that prior to the year 1824, the said *Richard Brooke*, who is yet alive and within this county, declared, that the said point marked black A, was the beginning of *Allanson's Folly;* and further offered to prove, by the deed to *Lott Mason* aforesaid, by the defendant's locations and explanations, numbered 8, made on amendment or plats 8th March 1824, and by the last will and testament of *Lott Mason,* and the last will and testament of *William Budd,* 8th explanation of the defendant is as follows, viz :

"8th. The defendant locates for her defence, in addition to *Davis' Park* above, the seizin and possession of *Richard Brooke* and *Walter T. Brooke,* of part of a tract of land called *Nonesuch,* according to the deed of said *Walter T. Brooke* and *Richard Brooke,* to *Lott Mason.* The possession and seizin of *Lott Mason* of the same land, and his dying seized and possessed. The will of *Lott Mason,* and the seizin and possession of the same land by *William Budd,* and his dying so seized and possessed. The will of said *William Budd,* and the seizin and possessions of the defendant; and she confines her defence to *Davis' Park* as above, and that part of *Nonesuch* as above; beginning that part of *Nonesuch,* as above, at C, and running thence, (according to the proof of the lines, boundaries and possessions of the parties above,) in the red drawn lines, dotted with black No. 10, 11, to *Chickamuxon* creek; then down and with said creek to *Potomac* river; then down and with *Potomac* river to B; then with the red drawn lines, dotted black, and No. 17 and 18 to A; then in the black drawn line No. 4 to K; then to the beginning, containing, &c.

The will of *Lott Mason,* dated 11th June 1828, contained the following devise :

"I give and devise to my nephew, *William Budd*, my plantation on the river called *"Nonesuch,"* or commonly known by the name of *"Brooke's Ferry,"* and my dwelling plantation, with the several tracts thereto belonging, which I now have a right or title to, to him and his heirs forever."

The will of *William Budd* devised to his wife, *Artemisa Budd*, "all my estate, both real and personal, during her life;" and that the said defendant claims title to the lands in dispute, through and under said *Richard Brooke*, and that the said point black A, is one of the corners of the land known and reputed as *"Nonesuch."*

The defendant objected to all such evidence for the purpose offered, and prayed the court to reject the same; but the court, (Stephen, C. J., Key and Dorsey, A. J.,) overruled said objection, and allowed the plaintiff to give the evidence above offered and objected to. The defendant excepted.

2nd Exception. At the trial of this cause, the plaintiff, in addition to the evidence stated in the preceding bill of exceptions, made a part thereof, gave evidence to prove, that the second boundary of *Allanson's Folly*, stood at the point marked G on the plats filed in this cause; and then moved the court to instruct the jury, that upon the true construction of the patent of *Allanson's Folly*, its first line must be run from the true beginning thereof, as found by the jury, so as to bind on *Chicka-muxon* creek, to the place where the jury shall find the second boundary of *Allanson's Folly* stood; and if the jury shall find, that the said first and second boundaries of *Allanson's Folly*, or either of them, do not stand on *Chickamuxon* creek, then it is lawful to supply a course from the point of said creek, nearest to said boundaries, or either of them respectively. Which instruction and opinion the court gave. The defendant excepted.

3rd Exception. The plaintiff, in the trial of this cause, in addition to the evidence in the preceding bills of exceptions, which are made a part of this, having read in evidence the patent of *Wicksall*, proceeded to show that it was truly located, by locating the termination of its first line, at the point marked and designated on the plats as *Moss' Point*, relying on the

several explanations of his location of *Wicksall*, filed in this cause, as the place where the oak tree stood, and which is the point of intersection on the plats of red line marked 12, and black line marked 50; but the defendant, by his counsel, objected, upon the ground that the place where the second boundary of *Wicksall*, as described in the patent, (being a marked oak,) stood, was not sufficiently designated in the plots or explanations; but the court, (KEY and DORSEY, A. J.,) were of opinion, and so instructed the jury, that by the plots and explanations, the place where the second boundary of *Wicksall*, as described in the patent, stood, was sufficiently designated at the point aforesaid, being the termination of the first line aforesaid, 12 and 50, as mentioned on the plots; to which instruction of the court, the defendants excepted.

4TH EXCEPTION. In addition to the evidence contained in the aforegoing bills of exception, which are made parts of this, the plaintiff, in further support of the issues on their part joined, and to show that the marked oak, described in the patent of *Wicksall*, as the second boundary thereof, formerly stood at the point where the second line marked 50 on the plots, intersects *Chickamuxon* creek, marked *Moss' Point*, as claimed to be located in the third bill of exceptions, offered to prove by *Francis Dunnington*, a competent witness, sworn upon the survey, that he was present at the running of the line from small *f*, on the plots, to the termination thereof, at *Moss' Point*, marked on the plots; that said point is the outermost and most prominent point at the mouth of *Chickamuxon* creek; that there were two or three small points run, but none on the river; that at ——— the mouth of the creek, and that said *Moss' Point* is the first point reached, in running first line of *Wicksall;* that near said point, the bank terminated abruptly, and seemed as if a portion might have been worn away by the action of the waters, and the lapse of time; that at said point there was no tree, nor did he ever, at any time, hear that a tree had stood upon the said point; to the admissibility of all which evidence, to prove that the marked oak, mentioned in said patent of *Wicksall*, as the second boundary thereof, stood at the said point, as located in the plots, the defendants, by their

counsel, objected; but the court, (KEY and DORSEY, A. J.,) overruled the objection, and permitted the evidence to go to the jury, for the purpose of showing where the marked oak, the second boundary of *Wicksall,* formerly stood. The defendant excepted.

5TH EXCEPTION. At the trial of this cause, in addition to the evidence contained in the preceding bills of exceptions, which are made a part thereof, the plaintiff read in evidence the patent of *Aspinall's Hope,* (previously inserted,) and proved its beginning at *Moss' Point,* where the line marked 50, strikes the water line of *Chickamuxon* creek, being the point distinguished on the plots by the words "*Moss' Point.*" And the plaintiff then claimed, to run the first line of *Aspinall's Hope* according to its true course and distance, as given in said patent, with an allowance of *thirty degrees* of variation to the westward of said patent course, drawn with the usual allowance for variation, from the date of said patent, so as to bind the said *Potomac* river; and for the purpose of claiming said allowance of variation in said line of *Aspinall's Hope,* the plaintiff offered to prove, by *James Brawner,* a competent surveyor, who made the plots and executed the surveys in this cause, that he can ascertain to a mathematical certainty, from the plats in this cause, and the locations thereon made by him, according to his several surveys, the variation required on the patent course of the first line of *Wicksall,* (from the date of said patent of *Wicksall,*) so as to bind said first line of *Wicksall* on *Chicka-muxon* creek, and that the variation required for that purpose in said first line of *Wicksall,* over and above the variation usually allowed in similar cases, is thirty-eight degrees to the westward; *to* which evidence the defendant, by her counsel, objected, upon the ground that the first line of *Wicksall* is not located on the plots in this cause, by course and distance, and that admitting such variation to exist between the first line of *Wicksall,* according to the course and distance in the patent, and the said first line as located on the plots in this cause, it is no evidence to authorise the jury to find similar variation, in order to bind the first line of *Aspinall's Hope,* on the *Potomac* river, because the said river is not called for by the patent of *Aspinall's Hope;*

but the court, (STEPHEN, C. J., KEY and DORSEY, A. J.,) overruled the objection, and admitted the evidence to go to the jury, to which opinion and admission of said evidence by the court, the defendant excepted.

6TH EXCEPTION. At the trial of this cause, the plaintiff, in addition to the evidence contained in the preceding bills of exception, which are hereby incorporated into this, read in evidence the patent of *Aspinall's Hope,* previously inserted, and claimed to run its first line from its alleged beginning, at *Moss' Point,* as distinguished on the plots in this cause, as to which beginning, he offered evidence to the jury, according to its true course and distance, with an allowance of thirty degrees of variation to the westward, (over and above the usual allowance of variation,) so as to bind said first line on and with the *Potomac* river; and for the purpose of proving said variation on said first line, the plaintiff offered to prove, by *F. E. Dunnington,* that he was present at the survey in this cause, when the surveyor ran the lines of *Aspinall's Hope,* from said *Moss' Point* around to the beginning; that at said survey, when he was present, the said surveyor ran the black dotted line from *Moss' Point,* which is the course and distance line of said *Aspinall's Hope's* first line, with the usual allowance for variation, but did not run said line binding on *Potomac* river, and that he has known the land included within said lines, so ran around to the beginning, for more than forty years, where *William Milstead,* now dead, resided on said land, and acknowledged himself the tenant of *Commodore Walter Brooke,* now deceased, the grandfather of some of plaintiff's lessors, and the father of other of them. And that the said land is part of the tract, which he always heard and understood was called and known as "*Nonesuch.*"

And the plaintiff further offered to prove, that the persons living on said land, included in said lines as aforesaid, have for the last forty years, held, possessed, cultivated and used up to the edge of *Potomac* river; that he never heard or knew the said land to be called *Aspinall's Hope* until the day of survey; to which evidence, for the purpose aforesaid, the defendant, by her counsel, objects; but the court were of opinion, that the

evidence above offered, was admissible to go to the jury, for the purpose aforesaid, admitted the same; and to which opinion and admission the defendant excepted.

7TH EXCEPTION. At the trial in this cause, in addition to the evidence contained in the former bills of exception, which are herein incorporated, the plaintiff further to support the issue on his part joined, and for the purpose of establishing the true location of the line of the patent of *Aspinall's Hope*, calling to run, binding on *Fletcher's Addition*, from the place where the plaintiff alleges stood the chesnut oak, as called for in said patent of *Aspinall's Hope*, marked red B on the plats in this cause; and proved by *F. E. Dunnington*, to be the upper corner of *Fletcher's Addition*, offered to read in evidence a plot made out by *Theophilus Hanson*, surveyor in a cause in the general court of *Maryland*, wherein the lessee of *Walter Brooke*, was plaintiff, and *James Davis* defendant; and accompanied said offered evidence with a farther offer to read the locations made on said plot by *Commodore Walter Brooke*, the lessor of the plaintiff in said cause, together with his explanations of his locations on said plot, (all of which said locations, explanations and plot, it is hereby agreed, may be read in the Court of Appeals, together with the record in said recited cause, from the original papers in said cause, filing among the records of said general court, to have the like effect as if the same were herein fully incorporated;) and further offered to prove, by *James Brawner*, a competent surveyor, who made the plots in this cause, that he did actually run in the survey in this cause, the second line of *Fletcher's Addition*, according to the patent course and distance thereof, reversing its course and distance from red B aforesaid, with the usual allowance for variation, from the date of said patent of *Fletcher's Addition*, which line is marked on the plots in this cause 52, and at the termination of which line, no red oak could be found or proved, as called for in said patent. To all which evidence, for the purpose aforesaid, the defendant, by her counsel, objected, under the plots and explanations in this case, but the court overruled the objection, and permitted the said plot and explanations thereof, made by said *Walter T. Brooke*, to be read in evidence to the

jury, so far as the said line from red B, above described, to its termination on the plots in this cause, to which permission of the court, the defendant excepted.

8TH EXCEPTION. At the trial of this cause, in addition to the evidence contained in the preceding bills of exception, made a part hereof, the plaintiff, for the purpose of shewing that the patents of *Aspinall's Hope*, *Wicksall*, and part of the patent of *Allanson's Folly*, as located by him on the plots of this cause, have acquired by reputation the name of *Nonesuch*, then offered in evidence by *F. E. Dunnington*, a competent witness, that he was present and sworn on the survey in this cause of the patents of *Wicksall*, *Aspinall's Hope*, and *Allanson's Folly*, as located by the plaintiff on the plots; that he has known the lands included within the lines of said patents as above located, for more than forty years past, and that the same lands included within the lines of said patents of *W.*, *A. Hope*, and part of *A. F.*, as located by the plaintiff on the plots in this cause, he has frequently heard called in the neighborhood, previous to the institution of this suit, by the name of "*Nonesuch;*" but the said *Dunnington* at the same time proved, on cross-examination by the defendant's counsel, that he never saw *Nonesuch* surveyed; but from the holdings he believes *Nonesuch* covers more land than is included within the lines of said patents of *Wicksall*, *Aspinall's Hope* and part of *Allanson's Folly*, as above located, but the lands so included in the patents of *Wicksall*, *Aspinall's Hope*, and part of the patent of *Allanson's Folly*, as above located, are covered by the land called "*Nonesuch*," as aforesaid. And the plaintiff then, farther to shew the extent and lines of the land called "*Nonesuch*," offered to read in evidence the location by the defendant on the plots in this cause of a tract of land called "*Nonesuch*," together with the defendant's explanations of her said location.

To all which offered evidence the defendant by her counsel objected, but the court overruled said objection, and allowed the plaintiff to give in evidence the testimony of said *Dunnington*, so offered by the plaintiff; and the court also decided to allow the defendant to give in evidence at her option, the mat-

ters stated by the said *Dunnington* on his cross-examination as aforesaid; and the court farther allowed the plaintiff to read in evidence the defendant's location of the land called "*None-such,*" on the plots in this cause, together with the defendant's explanations of said location; to all which ruling and decision of the court, the defendant excepted.

9TH EXCEPTION. At the trial of this cause, the plaintiff, in addition to the evidence contained in the preceding bills of exceptions, made a part hereof, offered to read in evidence to the jury the enrolment of a deed from *Humphrey Aspinall* to *Elizabeth Swinburne,* her heirs and assigns, dated 1st March 1684, for all that parcel of land called, lying, situate and being in *Charles* county, being part of a parcel of land called "*Allanson's Folly,*" lying, &c.; also a parcel of land called "*Wicksall,*" lying on the south side of *St. Michael* creek, formerly called *Chingomuxon* creek; beginning at a bounded oak, &c.; also a parcel of land called "*Aspinall's Hope,*" being, &c.; and beginning at a bounded oak, a bounded tree of a parcel of land called "*Wicksall,*" standing on the south side of *Chingomuxon* creek, on a point at the mouth of the said creek, &c.

"Recorded in liber L, folio 132, a book found among the records of *Charles* county court; also the deed or assignment of *William Moss* to *George Mason,* recorded in liber Z, folio 291; and the enrolment of a deed from *Humphrey Aspinall* to *Elizabeth Swinburne,* found in said last mentioned liber Z, at page 196, (the said liber Z being one of the land records of *Charles* county,) and which last mentioned deed, from said *Aspinall* to *Swinburne,* immediately precedes the enrolment in said record of said deed from *Moss* to *Mason.* "*Capt. Robert Collson,* in the behalf of *Col. Geo. Mason,* desires the two deeds following to be recorded, the said *Col. Mason* living in the colony of *Virginia.*"

The first was the deed aforesaid of 1st March 1684, to which no certificate of acknowledgment was appended, though certified to be a copy by the clerk of *Charles* county court, &c.

The deed from *William Moss* to *George Mason,* dated 18th June 1705, was in confirmation of a conveyance to *Elizabeth Swinburne,* from *Humphrey Aspinall,* to which no acknowledgment was appended, nor did it appear when recorded.

And the plaintiff further offered to accompany said deeds, by reading in evidence a duly certified copy or extract of the rent rolls of *Maryland,* shewing *Wicksall* and *Aspinall's Hope* to have been in the possession of *Col. Mason,* of *Virginia.*

"Acres, 200.—Yearly rent, " 4 "—' *Wicksall,*' surv'd 3rd Feb'ry 1667, for *Thos. Allanson,* assigned *John Hitchinson,* on the S. side *St. Michael's* creek, formerly called *Chingomuxon.*—Poss'r *Coll. Mason,* in *Virginia.*—This land is said to be escheat."

In testimony that the aforegoing is a true copy from old rent roll, No. 1, for *Saint Mary's* and *Charles* counties, folio 353, one of the records belonging to, and remaining in the *Western Shore Land Office of Maryland,* I have hereunto

(Seal.) set my hand and affixed my official seal, this 25th day of April 1842.

George G. Brewer,
*Reg'r Land Off., W. S., Md.*

"Acres, 150.—Yearly rent, " 6 "—' *Aspinall's Hope,*' surv'd 12th Feb'y 1667, for *Henry Aspinall,* at a b'd oak, a b'd tree of a parcel of land called ' *Wicksall,*' on the S. side *Chingomuxon* creek.—Poss'r *Col. Mason, in Virginia.*— This land is said to be escheat, and is escheated into *Nonesuch.*"

In testimony that the aforegoing is a true copy from old rent roll, No. 1, for *St. Mary's* and *Charles* counties, folio 356, one of the records belonging to, and remaining in the *Western Shore Land Office of Maryland,* I have hereunto

(Seal.) set my hand and affixed my official seal, this 25th day of April 1842.

George G. Brewer,
*Reg'r Land Off., W. S., Md.*

Also, the will of *George Mason,* of *Virginia,* dated 29th January 1715, which contained the following devise:

"*Item.*—I give and bequeath unto my son, *Thomas Mason,* all the land which I bought of *William Moss,* in *Maryland,* and all the land that I bought of *Michael Vanlandegham,* in *Stafford* county, to him and his heirs forever."

This will was admitted to *probat* in *Virginia*, 14th Nov. 1716, and certified from the records of the court there, to be a true copy; and also certified, by the presiding judge, under the act of congress, as in due form, and by the proper officer.

And farther offered in evidence, that the said *Geo. Mason*, the testator, left at his death, as issue of his third wife, two infant sons, named *Thomas* and *Francis*, and their sole sister of the whole blood named *Sarah*—that said *Thomas* and *Francis* died while infants without issue, leaving their said sister *Sarah* as their sole heir at law, which said *Sarah Mason* intermarried with *Thomas Brooke*, and was with her said husband in the possession of the lands in dispute, whom she survived, and died previous to the year 1786, leaving surviving her, *Walter Brooke*, her eldest son, and *Richard Brooke*, her grandson, by *Richard Brooke* her second son, which said *Richard*, son of said *Sarah*, died previously to said *Sarah;* and the plaintiff further offered in evidence, that the lands in dispute were possessed by said *Sarah* during her life, and by said *Walter Brooke*, after her death, and that after his death, in 1798, the same were possessed by *Walter D. Brooke*, the eldest son of said *Walter*, until his death, in 1811, and from that time by the widow of said *Walter D. Brooke*, in behalf of his children, until 1824, when the deed to *Lott Mason* was executed; and farther gave evidence to shew, that some of the lessors of the plaintiff are the heirs at law of said *Walter Brooke*, and that others of them are the heirs at law of said *Walter D. Brooke*.

To the whole of which evidence, as above offered, the defendant objects; but the court overruled said objection, and permitted the deeds, aforesaid, and will to be read in evidence, so far as they purport to convey or devise the tracts of land called *"Wicksall"* and *"Aspinall's Hope,"* as located, by the patents thereof, on the plots in this cause; and the court, (STEPHEN, C. J., KEY and DORSEY, A. J.,) allowed all the other evidence so offered to be given in evidence, and upon the said evidence so admitted, the court instructed the jury as follows: that if the jury find, from the evidence aforesaid, that the said *Geo Mason*, the above testator, and those claiming under him,

were in the exclusive, uninterrupted and adverse possession of the said tracts of land called "*Wicksall*" and "*Aspinall's Hope*," from the date of said deed from *Moss* to said *Mason*, claiming under said deed, down to the year 1824, then the jury may and ought to presume regular conveyances from the original patentees of said tracts of land to the said *Geo. Mason* and his heirs; to the admission of which said evidence, and the giving of which said instructions, the defendant excepted.

10TH BILL OF EXCEPTION. At the trial of this cause, the plaintiff, further to support the issue joined on his part, in addition to the evidence contained in the aforegoing bills of exceptions, made a part hereof, gave in evidence the patent of *Nonesuch:*

"*Sarah Brooke, Walter* and *Richard Brooke's* patent—450 acres—'*Nonesuch.*' *Frederick, &c:*—Know ye, that whereas *Sarah Brooke*, (on behalf of herself, and *Walter* and *Richard Brooke*, infants, under the age of twenty-one years,) of *Charles* county, by her humble petition to our agents for management of land affairs within this province, did set forth, that *Thomas Brooke*, the petitioner's husband, late of *Charles* deceased, did heretofore, by his petition, set forth, that there was escheat to us the following tracts or parcels of land, lying and being in the county aforesaid, and contiguous to each other viz: one hundred acres, part of a tract or parcel of land called '*Allanson's Folly*,' originally, on the 23rd June, A. D. 1663, granted unto a certain *Thomas Allanson*, for four hundred acres; '*Wicksall*,' originally, on the 25th November, A. D. 1667, granted unto a certain *John Hitchinson* for two hundred acres, and '*Aspinalls Hope*,' originally, on the 16th March 1681, granted unto a certain *Henry Aspinall*, for one hundred and fifty acres, all which tracts were the right of a certain *Henry Aspinall*, who died thereof possessed, intestate and without heirs, or making any legal disposition thereof, by which means the same became escheat to us; and the petitioner, *Thomas Brooke*, being the first discoverer, humbly prayed to be admitted to its purchase, (be it escheat by the means aforesaid, or by any other ways or means whatsoever,) and a special warrant to resurvey the same, with liberty of adding any con-

tiguous vacancy, and reduce the whole into one entire tract; and that on return of a certificate of such resurvey, he paying the purchase money, and complying with all other requisites usual in such cases, might have our grant of confirmation issue unto him thereon, which was granted him, and accordingly a warrant on the 18th January 1743, unto him for that purpose did issue; in pursuance of which warrant, a resurvey was made, and the certificate thereof returned into our land office, by which it appears the aforesaid tracts or parcels of escheat land contain the quantity of three hundred and ninety-six acres, and that there was the quantity of fifty-four acres of vacant land added, for which said escheat and vacancy, the said *Thomas Brooke*, in his lifetime, paid and satisfied unto *Benjamin Tasker, Esq,* our present agent and receiver general, for our use, as well the sum of, &c., being the purchase money agreed upon for the said escheat, as the sum of, &c., caution for the said vacancy, as also the sum of, &c., for some improvements mentioned to be made on the said vacancy; but before the said *Thomas Brooke* obtained our grant of confirmation for the same, he died, and by his last will and testament, devised the aforesaid escheat land, with the vacancy added, in manner and form following, that is to say:

"*Item.*—I give and bequeath unto my dear and loving wife, *Sarah Brooke*, all that tract or parcel of land whereon I now dwell, near *Chickamuxon*, in *Charles* county, distinguished by name, according to the patent of escheat, now in the office, together with all the negroes, stock and other personal estate I am now possessed of, to be enjoyed by her during the term of her widowhood, afterwards to be equally divided between my two sons, *Walter* and *Richard Brooke;* but if either of my. before mentioned sons die without issue, then I give and bequeath his part of the aforesaid tract of land and personal estate to the survivor of my two youngest sons, *Walter* and *Richard;* but if both of my said sons should die without issue, then I will and bequeath, that the aforesaid tract of land and personal estate should be equally divided between my loving wife, *Sarah,* and my eldest son, *Thomas Brooke,* to them and their heirs forever, my wife having her first choice.

The petitioner, therefore, humbly prayed, that forasmuch as all requisites were complied with, our grant of confirmation might issue on the certificate now in the land office, agreeable to the bequest aforesaid, which we have thought fit to condescend unto, according to *Charles, Lord Baron of Baltimore, &c.* We do, therefore, in consideration thereof, and other the premises, give, grant and confirm unto them, the said *Sarah Brooke, Walter Brooke* and *Richard Brooke,* all of them, the aforesaid tracts or parcels of escheat land, now resurveyed, with the vacancy added, reduced into one entire tract, and called "*Nonesuch,*" and bounded as follows: Beginning, &c. To have and to hold the same unto the said *Sarah Brooke, Walter Brooke* and *Richard Brooke,* their heirs and assigns forever, to be holden of us and our heirs, in free and common soccage by fealty only.   Sealed 27th August 1753," &c.

And the plaintiff gave proof to shew, that it was truly located by the plaintiff on the plots in this cause, the said plaintiff, at the same time, declaring, that he relied upon said patent for the purpose of claiming title to any vacancy granted by said patent, and to that part of *Allanson's Folly* included within the lines of said patent of *Nonesuch.*

And the plaintiff farther gave evidence to shew, that *Walter Brooke* survived *Sarah Brooke* and *Richard Brooke,* the other grantees in said patent; and farther offered in evidence the possession of *Sarah Brooke,* of said land, included within the lines of said patent; and after her death, previous to the year 1786, the possession of the same land by *Walter Brooke,* (the survivor of said *Sarah Brooke* and *Richard Brooke,* the other grantees in said patent;) and that *Richard Brooke,* son of the devisee, *Richard Brooke,* mentioned in said will of *Thomas Brooke,* was in possession, after his full age, of the part of the tract called "*Nonesuch,*" lying east of the black line, on the plots marked from red A to black K, and that for more than twenty years before the said suit was brought, the said *Richard,* and those claiming under him, have been in the exclusive possession of said part of *Nonesuch;* and the exclusive possession of the residue of said tract of land called "*Nonesuch,*" according to the location on patent thereof, was, by *Walter Brooke,* and after the death of

the said *Walter*, in 1798, the continued possession of the said residue of *Nonesuch,* by eldest son, *Walter D. Brooke,* until his death, in 1811, and after his death, the possession thereof by the widow of *Walter D. Brooke,* in behalf of her children, by said *Walter D. Brooke* until 1824, when the deed to *Lott Mason,* aforesaid, was executed.

And the defendant, thereupon, offered in evidence the escheat warrant granted to *Thomas Brooke;* his will as recited in the patent aforesaid; and the petition of the said *Sarah Brooke.*

Whereupon the plaintiff prayed the court to instruct the jury, that according to the true construction of the patent of *Nonesuch,* aforesaid, the said *Sarah, Richard* and *Walter Brooke,* the grantees therein, were joint tenants, in fee simple, of the land granted by said patent, and that if the jury find, that said *Walter* survived said *Sarah* and *Richard,* the other patentees, then the fee simple in said lands, so granted, devolved upon said *Walter;* which instruction the court granted. The defendant excepted.

11TH BILL OF EXCEPTION. Upon the evidence contained in the aforegoing bills of exceptions, the defendant prayed the court to instruct the jury, that if they find, from the evidence in the cause, that *Thomas Brooke* obtained a certificate of survey of the land in controversy, in the year 1743, as escheat land; and that he complied with all the requisites necessary to obtain a patent; and that he devised the land in controversy; and that the land in controversy, and that the persons claiming under him—*Walter Brooke* and *Richard Brooke,* their descendants, through which *Richard Brooke,* the defendant, claims title, had possessed the land in severalty, the jury might presume, from the great length of time since the date of the certificate of survey, that a grant had issued to *Thomas Brooke,* or to his devisees, in pursuance of his will; which instruction the court refused to give. The defendant excepted.

12TH BILL OF EXCEPTION. Upon all the evidence incorporated in the bills of exceptions, the defendant prayed the court to instruct the jury, that the plaintiffs cannot claim title to the lands in controversy, and maintain an action of

ejectment for the same, in virtue of the grant from the lord proprietory to *Sarah Brooke*, *Walter Brooke*, and *Richard Brooke*, because said grant is repugnant to, and in violation of the express terms of the will of *Thomas Brooke*, and is a fraud upon his devisees; provided the jury find, from the evidence in the cause, that *Thomas Brooke* obtained the escheat warrant for the land in controversy, and paid the composition money previous to his death; which instruction the court refused to give. The defendant excepted, and prosecuted this appeal.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, MAGRUDER and MARTIN, J.

By ALEXANDER and McMAHON for the appellants, and
By R. J. BRENT for the appellee.

DORSEY, J., delivered the opinion of this court.

The court below was right in rejecting the appellant's prayer in the first bill of exceptions. Instead of its specifying the parts of the testimony, to which the objection was intended to apply, the court was called upon to reject it in mass. If any part of it, therefore, was admissible, for the purpose for which it was offered, the court, in overruling the prayer, committed no error. Where an entire prayer, made to the court, is good in part, and bad in part, that is, which the court ought to grant in part, and in like manner refuse, had the subject matter been properly divided, and a distinct prayer made on each subdivision, the court is not bound to assume, what appropriately belongs to counsel, the duty of analyzing the subject matter of the prayer, and admitting that which ought to be granted, and rejecting that which ought not; but the court may content itself in granting or rejecting the prayer, according to its merits, as presented in its entirety. There is no error, therefore, in the court's opinion complained of in the first bill of exceptions; some of the evidence, objected to, being undeniably admissible. See *Elliot et al. vs. Peirsol et al.*, 1 *Peters*, 338, and *Moore vs. The Bank of Metropolis*, 13 *Peters*, 310.

The appellees prayer, in the second bill of exceptions, which was granted by the court, was "to instruct the jury, that upon the true construction of the patent of *Allansons Folly*, its first line must run from the true beginning thereof, as found by the jury, so as to bind on *Chickamuxon* creek, to the place where the jury shall find the second boundary of *Allansons Folly* stood; and if the jury shall find the said first and second boundaries of *Allansons Folly*, or either of them, do not stand on *Chickamuxon* creek, then it is lawful to supply a course from the point of said creek nearest to said boundaries, or either of them, respectively." If there are binding expressions in the patent of *Allansons Folly*, which bind its first line on *Chicka-muxon* creek, the granting of that part of the prayer which relates to the first boundary, would follow as a matter of course, according to the settled principles of locations, in actions of ejectment in *Maryland*, as established by the decisions of its highest judicial tribunals. But not so as to the second boundary. Instead of the line, supplied to reach that boundary, being run from the point on the creek nearest to it, the line must be run from the point on the creek where the two hundred perches, (the distance expressed in the patent,) expended on the meanders of the creek, terminate. The line from that point to the second boundary, is the line to be supplied to connect that boundary with the binding call of the first line of *Allansons Folly*, with the creek. In determining on the correctness of the remaining portion of the court's decision in this bill of exceptions, all we have to do is to ascertain, from an inspection of the patent of *Allansons Folly*, whether, from the true construction of the calls and expressions in the grant, its first line does imperatively bind on the creek. *Allansons Folly* is described in the patent as lying "on the south side of a creek called *Chincomuxon* creek, beginning at a marked white oak, standing on the west side of a little creek called *St. Katharine's* creek, and running east north east up *Chincomuxon*, for breadth the length of two hundred perches to a marked oak." Had no other more binding expression, in relation to this line, been used in the patent, the line must be run in a straight direction from boundary to boundary: the words, "running up a creek,"

not being a binding call, but merely indicating the general direction of the line referred to. This, however, is not the only binding expression in the patent, in relation to this line, as one of the bounds of the entire tract, which has four sides to it. The patent, after stating how the tract of land is "bounded" on the east, how it is "bounded" on the south, and how it is "bounded" on the west, states, that it is bounded on the north, (where its first line runs,) with *Chincomuxon*. In arriving at the true construction of this patent, it is a matter of no moment that this binding expression is used after all the other lines and bounds of the tract of land had been given. Appearing where it does, it as much controls the location of the first line as if it had immediately preceded it in the patent. By adopting this construction, we reconcile all its parts, and gratify the full import and meaning of every word in the patent, except the course of the line, which in all cases is held to interpose no obstacle to the gratification of a conflicting, binding call; but disregard this binding call, and there are virtually expunged from the patent, the words, "on the north, with *Chincomuxon*," words so emphatically inserted to declare, and establish the northern bounds of the land granted. Thus reversing one of the most just and sound principles of the law, that deeds are to be construed most strongly against the grantor, for the benefit of the grantee. And this reversal, will be made after this rule of construction has been adopted and proclaimed, in, perhaps every land trial in the State, where its influence could have been felt. Nothing but the error of the county court, in fixing the place of the beginning of the supplied line to reach the second boundary, prevents our giving to its granting the prayer of the appellees in this bill of exceptions, our entire concurrence.

Were the county court right in overruling, as it did, the appellants objection to the location of the first line of *Wicksall*, as terminating at the extremity of the point at the mouth of the creek, is the only question for our consideration under the third bill of exceptions?

The boundary being lost, and no evidence being adduced of the place where it stood, the appellees, disregarding the

course and distance, located the line as above mentioned, upon the ground, as we presume, that although no proof was offered as to the actual locality of the tree itself, yet that the patent, by binding the line on the creek, so identified the spot where it stood, that the course and distance are to be disregarded; and that by proving to what point the call referred, the termination of the line was established as at the extremity of the point. The first line of *Wicksall* calls to run south-west, down the creek, for breadth the length of one hundred perches, to a marked oak standing upon a point at the mouth of the said creek, and this line is made to bind on the creek, by language almost identical with that, which we have said binds the first line of *Allansons Folly* on the creek. But, for this binding call, under the proofs in this cause, we think that the location of the first line of *Wicksall*, in disregard of its course and distance, would be manifestly erroneous. Where a bounded tree, called for as standing at the end of a line, cannot be found, nor the particular spot where it stood, be identified, to run the line by its course and distance, is the best means left of ascertaining its true location and terminus. The fact that the boundary called for is represented by the patent as standing upon a point at the mouth of a creek, is, in the event of its loss, too vague and indefinite to control the positive expressions of the grant, as to course and distance. By pursuing the course and distance, we have the fixed and specified means of obtaining the identity of the spot where the line is to terminate. To reject the course and distance, is to determine, that the particular spot, on which the boundary stood, is ascertained with reasonable certainty. The statement in the patent, that it stood on a point at the mouth of a creek, is not, of itself, sufficient evidence of its identical locality. Such a point may be ten feet long, or it may be a mile long, and it may be subject to the same uncertainty as to its breadth. There is no semblance of analogy between such points and mathematical points. The expression, standing on a point at the mouth of a creek, identifies no particular spot as that whereon the tree called for stood. The expression in the grant is equally gratified, whether you locate the tree on the north end, or the south end, the east

side, or the west side of the point. The call for a bounded tree, standing on a point at the mouth of a creek, where the tree, and spot where it stood, are lost, and are both incapable of ascertainment with a reasonable degree of certainty, ascertains with less certainty than the course and distance, the termination of the line, and therefore, cannot control them; certainty being the controlling object in all locations. But the peremptory, binding call for the creek, in the patent of *Wicksall*, changes, in this case, the general rule, that a line calling for a lost boundary must be run by its course and distance. If the tree had not been lost, there would have been two imperative calls, both of which, if practicable, must have been gratified. The line must have terminated at the tree, and it must have been made to bind on the creek, until its distance (that is number of perches,) was exhausted at some spot on the margin of that projection of land at the mouth of the creek, called the point. And if the tree called for had stood at some distance from that spot, a line, not called for in the patent, must be run from it to such boundary. See *Dorsey's Ejectment*, 69 and 70, and the diagram in the same book, 50. But if, as here, the bounded tree be lost, and the spot where it stood incapable of ascertainment with a reasonable degree of certainty, there can be no such interpolated line, and the line in question must terminate at the spot above mentioned. There is nothing in the calls in the patent of *Wicksall*, which terminates its first line at the extreme verge of *Moss' Point*. In perfect consistence with those calls, it might have terminated at any other place upon the margin of that point. We, therefore, think the court below erred in assuming, as a matter of law, and so instructing the jury, that the termination of the first line of *Wicksall* was at the north western extremity of *Moss' Point*.

In overruling the appellant's objection to the testimony of the appellees in the fourth bill of exceptions, we think the county court erred, not only for the reasons we have stated, as to the second bill of exceptions, but upon another ground:—the testimony offered, had no tendency to prove where the marked oak stood, and, therefore, should have been rejected on account of its immateriality.

There is error in the court's opinion, overruling the appellant's objection to the testimony offered in the fifth bill of exceptions. If for any reason, no matter whether it be for the reason assigned or not, the testimony objected to, be inadmissible for the purpose for which it is offered, it should be rejected by the court. The appellees having proved the beginning of *Aspinall's Hope* to be "at the point distinguished on the plots, by the words, *Moss' Point*," claimed to run the first line of *Aspinall's Hope* according to its courses and distances, as in the patent thereof, "with an allowance of thirty degrees of variation to the westward of said patent course, drawn with the usual allowance for variation, from the date of said patent," so as to bind on the *Potomac* river; and for the purpose of sustaining said allowance for variation in the first line of *Aspinall's Hope*, offered to prove, by *James Brawner*, a competent surveyor, who made the plats and executed the surveys in this case, that he could ascertain to mathematical certainty, from the plots in this cause, and the locations made by him, according to his several surveys, the variation required in the patent course of the first line of *Wicksall*, (from the date of said patent of *Wicksall*,) so as to bind said first line of *Wicksall* on *Chickamuxon* creek, and that the variation required for that purpose, in said first line of *Wicksall*, over and above the variation usually allowed in similar cases, is thirty-eight degrees to the westward. To this evidence the defendants objected; but the court overruled the objection, and permitted the evidence to go to the jury. In so doing, we think the county court was clearly in error. The testimony offered, had no connection with, or bearing upon the question, as to what correction ought to be allowed for the variation of the magnetic needle, to ascertain the true original location of lands held by courses and distances. To open the door to such proof, under the circumstances in which it was offered, would unsettle the rights of all land-holders, whose estates are held by courses and distances, and introduce a multiplicity of litigation and confusion in land titles, of which the foresight of man can form no estimate. It would unsettle the whole theory of allowance for variation in the surveying of lands, as practised under and

established in *Maryland*, and substitute in its place, a standard ever changing and utterly uncertain, and which had not the slightest relevancy to the allowance which ought to be made, according to the established principles and experience of ages, upon the subject. The first line of *Wicksall*, by the terms of its patent, binds on *Chickamuxon* creek, and in running it, therefore, its course is rejected, and the line run in conformity to the imperative call, in the same manner as if its course had not been expressed in the patent. In locating the first line of *Wicksall*, you do not run it the course expressed in the patent, corrected for variation by such a number of degrees, as will make it conform to the binding call imposed on it; but you reject altogether the course in the patent, and run the line the course which will gratify the call, in the same manner as if no course for the line were expressed in the patent. You gratify the call, and shape your course by the point of the needle, and the question of variation has nothing to do with such a proceeding. If a due south line, with a binding expression in the patent, which takes it due north, is to be located, the surveyor must run the line due north by the point of the needle, and in such a case, he never dreams that he is doing what, if the testimony objected to be admissible, we assume that he has done, viz: corrected the course in the patent one hundred and eighty degrees, as an allowance for variation. In changing the course to gratify a call, the line is run accordingly, either to the east or to the west, without regard to the fact, whether, from the date of the original survey to the time of the location of the line, the variation of the needle has been to the east or to the west, and, consequently, no such fact could be deduced from it, as that for which such testimony has been offered in the case before us.

Of the opinion of the county court, in the sixth bill of exceptions, we think the appellant has equal cause to complain. The court ought to have rejected the testimony, for the purpose for which it was offered, as well for the reasons assigned in the preceding bill of exceptions, as on account of its immateriality and irrelevancy to the subject matter, which was designed to be deduced from it. It had not the slightest tendency to prove,

that an allowance of thirty degrees, over and above the usual allowances, ought to be made, for the purpose of binding on the *Potomac* river, the first line of *Aspinall's Hope*. What was the testimony offered in this bill of exceptions, to establish this unnatural and irrational allowance for variation? First, the patent of *Aspinall's Hope*, which gave not the slightest countenance to such a deduction; and secondly, the oral proofs that the tenants of *Walter Brooke*, and those claiming under him, had possessed the land lying between the first and second line of *Aspinall's Hope* and the *Potomac* river; but that the witness never knew or heard, that the land so possessed was called *Aspinall's Hope;* on the contrary, that he always heard and understood, that it was called and known as "*Nonesuch*," a tract of land located in this cause, as containing the land in question. How this proof had any tendency to establish this extraordinary allowance for variation, we are unable to discover.

The only ground for an objection to the testimony offered in the seventh bill of exceptions, which we can discover, is, that the locations made of the plot offered in evidence, have been so unintelligibly represented on the plots and explanations in this cause, that it was almost impossible for either the court or jury to say, whether the locations on the plot offered in evidence, were truly located on the plots filed in this cause. And upon no other principle, than its apparently correct location, could it be given in evidence, to support any of the locations made on the plots before us. It is true, that the surveyor has certified, in his explanations returned with the plots, that "the plaintiff locates a plot made out by *Theophilus Hanson*, in an ejectment suit, wherein the lessee of *Walter Brooke* was plaintiff, and *James Davis* was defendant, which said plot is endorsed, 'filed 23rd of October 1789.' " "All the locations made on said plots, are transferred or copied on the plots returned in this cause, and are to be taken and considered, to all intents and purposes, the same as original locations in this cause, as well as evidence of the locations made by *Walter Brooke*, in said ejectment suit; and will also be relied on by the plaintiff, as explanatory of the grounds of said ejectment, the finding of the jury, and the possession delivered to said *Walter Brooke*,

by judgment of the *General Court of Maryland*." But how the lines thus located, are distinguishable from the other locations on the plots; where they commence or terminate; with what calls, or by what courses and distances they are run, we are left to speculate on the wide ocean of conjecture and uncertainty, without chart or compass to guide us, on our hopeless voyage of discovery. If there be any case in which, on account of an almost infinitude of locations, and a failure of the surveyor to file with the plots returned, the explanations requisite to their comprehension by the court and jury, this court would be justified in reversing the judgment and remanding the case for a new trial,—the present is a fit case for the exercise of such a power.

Had the plots and explanations returned by the surveyor in this cause, identified, as they ought to have done, the lines to sustain the location, of which the plot offered in evidence was adduced, and it had appeared that they had been truly located, then, would the plot offered in evidence have been clearly admissible. But, in consequence of the defects of the plots and explanations of the surveyor, it not appearing affirmatively to the court, that the lines in question had been truly located, conformably to their location on the plot from which they were taken, on the objection raised to the plot offered in evidence, we think the court below ought to have rejected it.

In admitting, for the purpose for which it was offered, the testimony of the appellees, objected to by the appellant in her eighth bill of exception, we also impute error to the court below. The plaintiffs below, had not located *Wicksall, Aspinall's Hope*, and part of *Allanson's Folly*, as a body of land, which had acquired the name of *Nonesuch*, by reputation. On the contrary, their location of *Nonesuch*, professed to have been made according to its patent; and the location of *Nonesuch*, as made by the appellant, and offered in evidence by the appellees, is also stated to have been made agreeably to the patent. There being, then, no location of *Nonesuch*, as a parcel of land which, by reputation, had acquired that name, there could have been no counter-location thereof, and consequently, the evidence offered to prove it, was out of the issues in the cause.

In what we have said on this bill of exceptions, we are not to be understood as intimating any opinion, that, under the circumstances of this case, (if, indeed, under any circumstances it could be done,) the appellees could recover the lands in controversy, under the name of *Nonesuch,* as a name acquired by reputation.

Had the county court, in the ninth bill of exceptions, as it did in the first, have contented itself with simply overruling the general objection raised to all the testimony offered, and leaving it, as being no otherwise objected to, to go to the jury, for the reasons assigned by us in the examination of the first bill of exceptions, the course pursued by the county court would have been sustained by this court. But such was not the course pursued by the court below. It did not content itself with overruling the objection made, and permitting the testimony to pass to the jury as otherwise unobjected to, but it proceeded to analyse the proof, and to pronounce its opinion to the jury upon the admissibility of several portions of it, and asserted all the evidence offered, to be admissible, and gave thereon an instruction as to its legal effect and operation. In doing so, the court did not, as in the first bill of exceptions, assume a mere passive attitude by permitting testimony to go to the jury, to which no valid objection had been urged; but its action was positive; it decided, that not only were certain enumerated portions of the testimony competent to go to the jury, but that all of it was admissible before them. If then, any portion of the testimony offered in this bill of exceptions (material to the issues on the trial before the jury,) was incompetent, the judgment of the county court must be reversed. The duty, therefore, to some extent, devolves upon us, of examining the several parts of the evidence submitted to the jury, to see how far each and every portion of it is admissible. The first part of the testimony, the admissibility of which is sanctioned by the county court, is the copy of the deed from *Humphrey S. Aspinall* to *Elizabeth Swinburne,* and the copy of the deed from *William Moss* to *George Mason,* and the copy of *George Mason's* will. To render an exemplified copy of a deed, admissible in evidence, to prove title to the land which the deed

professes to convey, it must appear to have been executed with all the essential forms required to warrant its enrolment under the laws of this State. In 1684, (the date of the alleged deed from *Humphrey S. Aspinall* to *Elizabeth Swinburne*,) the act of Assembly required that such a deed should be acknowledged before some of the judicial tribunals or public officers, enumerated, and recorded within one year. From the copy before us, it does not appear that this deed had been acknowledged pursuant to the provisions of the act of 1674, ch. 2. The recording of it, therefore, not being authorised by the act of Assembly, gave to it no additional validity, and the record thus made, or the exemplified copy therefrom, is no more evidence of the existence of the deed, than would be a copy of such deed certified by any private individual. This objection to the admissibility of the copy, has been attempted to be obviated by the assertion, that the act of 1674, ch. 2, did not require the recording of the certificate of the acknowledgment of a deed for lands. It is a sufficient answer to this assertion to state, that it is sustained by no judicial sanction in this State. That none of the various acts of Assembly prescribing the mode in which conveyances of land are to be made, direct the certificate of the acknowledgment of a deed to be recorded, except the certificate of the acknowledgment of a *feme covert*. Yet, from the passage of the act of 1674 to the present day, it has been the uniform custom of all recording officers to record such acknowledgments; and their authentications of such recording, have, in all the judicial tribunals of the State, been received as sufficient evidence of those acknowledgments. Such efficacy could not have been given by courts of justice to such authentications, unless they regarded such recording, as a compliance with the requisitions of our system of registration. The ruinous consequences to land holders resulting from this novel suggestion, are too obvious and alarming to permit its receiving, for a moment, the sanction of this court.

The deed from *Aspinall* to *Swinburne*, derives no validity from the confirmatory or curing provisions in the acts of 1692, ch. 30; 1699, ch. 42; and 1715, ch. 39; or either of them: those provisions only curing such defective conveyances, as

had been recorded within the year. That deed bears date on the first day of March 1684, and by an indorsement upon it, properly recorded with it, it is apparent that it could not have been recorded prior to the 10th day of December 1705, and, therefore, can derive no aid from the confirmatory enactments of 1692, 1699, and 1715. It would have been otherwise, had the deed appeared to have been recorded within the year. That is, it would have been admissible to sustain any locations made according to its courses, distances, and calls, upon the plots in the cause. To that extent it was admissible to shew title, or sustain the correct locations of *Wicksall* and *Aspinall's Hope,* but not to shew title to, or sustain the appellees locations of part of *Allanson's Folly,* because the deed professes to convey "part of a parcel of land called *Allanson's Folly,*" and in giving its description by courses and distances, it has but two straight lines, which can embrace no deed, or any part of the tract of land called "*Allanson's Folly.*"

But it is alleged, that the time of the recording of a deed is a matter of fact to be determined by the jury, and not a matter of law, resting in the decision of the court. To this, as an universal proposition, we cannot give our assent. The time of the recording of a deed is, sometimes, a matter to be determined by the court, and sometimes a question to be submitted to the finding of a jury. If it plainly appears, from indorsements officially made upon a deed, or its exemplification, that it has not been recorded within the time prescribed by law; and there is no admissible evidence in contravention of such indorsements, then the admissibility of the deed, or its exemplification in evidence, is determined by the court without any reference on the subject, to the jury. But if there be such admissible contravening testimony, as to the time of the recording of the deed, legally sufficient to be left to the jury to warrant them in finding that the deed was recorded in due time, then is the question, as to the time of recording of the deed, to be submitted with an hypothetical instruction from the court to the jury. As to the exemplification before us, there is no such contravening testimony, and the objection taken to its admissibility ought to have been sustained by the court.

In regard to the exemplified copy of the deed from *William Moss* to *George Mason,* the facts upon which its admissibility depends, are somewhat variant from those connected with the deed from *Humphrey S. Aspinall* to *Elizabeth Swinburne.* As to the former deed, it does not appear by any endorsements upon it, whether it was recorded in time or out of time. If in time, though unacknowledged and not indented, by the curing influence of the act of 1715, ch. 47, it would have been admissible to prove title to *Wicksall* and *Aspinall's Hope,* or to sustain locations made in conformity to it. In 1705, the date of the conveyance from *Moss* to *Mason,* a deed to be effectual for the conveyance of land, must have been recorded in one year. He who asserts title under such a conveyance, must prove its enrolment within the period prescribed by law. The *onus probandi,* in that respect, rests on him. The deed, it is true, is proven to have been recorded; but as to the time of its enrolment, there is not a shadow of proof. Why such proof, so accessible to both parties, was not produced, it is difficult to imagine. Had it been adduced, its sufficiency, in point of fact, to establish the enrolment of the deed within the requisite period, was a matter for the determination of the jury, not of the court. The county court, therefore, we think was in error, in assuming the jurisdiction which appropriately belongs to the jury. And the error is apparent, when we advert to the circumstance, that the court drew its conclusion, that the deed was enrolled in time, without any proof sustaining such an inference.

As respects the copy of *George Mason's* will, offered in evidence by the appellees, we cannot entertain a momentary doubt of its inadmissibility. Of wills of land in *Maryland,* our own courts, only, are authorised to take probate. If a title to lands in this State, is derived under *Mason's* will, its existence and validity must be proved by other testimony, than a mere exemplified copy of its probate, in a court in the State of *Virginia.*

From the instruction given by the court to the jury, in this bill of exceptions, we also dissent. This court having determined, that the copies of the deeds from *Aspinall* and *Moss,* and of the will of *Mason,* were inadmissible, as evidence under

the circumstances in which they were offered; and the appellees having shewn by their own testimony, that *Sarah Mason* was not an heir at law of *George Mason*, and as such, entitled to the lands in controversy, her possession not being lawfully derived from him, cannot be so connected with his, that from the long continuance of the possession by the two, (till 1824,) regular conveyances, from the patentees of *Wicksall* and *Aspinall's Hope*, might be presumed to the said *George Mason*. The possession of *Sarah Mason* being out of the question, the only possession on which this presumption of "regular conveyances from the original patentees" of *Wicksall* and *Aspinall's Hope*, is founded, is that of *George Mason*. And what is the proof of possession of these two tracts of land, and of its continuance by *George Mason?* The only evidence of his possession, is an extract of an entry from old rent roll, No. 1, for *St. Mary's* and *Charles* counties, which states *Col. Mason*, of *Virginia*, to be the possessor. But when that entry was made, or for how many years it was continued; whether the possession lasted for one year or twenty years, the admissible evidence in the cause, furnishes us with no means of ascertaining. For aught that we can know, *Col. Mason* may have been an intruder, and possessor for one year only. To make the presumption required in support of such possession, as that proved to have been in *Col. Mason*, cannot meet the approval of this court. Nor can we readily perceive how the county court, after sustaining the validity of the deeds from *Humphrey S. Aspinall* to *Elizabeth Swinburne*, and from *William Moss* to *George Mason*, could, in opposition to those deeds, and to their utter exclusion, direct the jury to presume regular conveyances from the original patentees of *Wicksall* and *Aspinall's Hope*, to *George Mason*. If the deeds of *Humphrey S. Aspinall* and *William Moss* were sanctioned by the court, they repelled the idea of conveyances from the original patentees to *George Mason;* and the only presumption of grants that could, consistently with its own decision, be raised by the county court, was from the patentees of *Wicksall* and *Aspinall's Hope* to *Humphrey S. Aspinall.*

30      v.3

Having, already, stated sufficient grounds for the reversal of the judgment of the county court upon the ninth bill of exceptions, we forbear to scrutinize other portions of the testimony therein detailed, to ascertain if they be not obnoxious to the objection taken to their admissibility.

The appellees, in the tenth bill of exceptions, "prayed the court to instruct the jury, that, according to the true construction of the patent of *Nonesuch*, aforesaid, the said *Sarah, Richard* and *Walter Brooke*, the grantees therein, were joint-tenants, in fee-simple, of the land granted by the patent; and that if the jury find, that said *Walter* survived said *Sarah* and *Richard*, the other patentees, then the fee-simple in said lands so granted, devolved upon the said *Walter.*" This instruction the court granted, and the correctness of their so doing, is the question we must decide, under the tenth bill of exceptions. In construing a grant, it is the duty of the court, first, to ascertain what the parties intended should be effected by it. And that intention being collected from an inspection of the grant itself, it is the duty of the court to give to it such an interpretation as will effectuate that intention, provided the terms and expressions used in the grant, will admit of such a construction. Looking to the premises only in this grant, we think that its design, and the intention of the parties to it, are too clearly and fully expressed, to admit of any reasonable doubt as to what they were. It states, in substance, that the grantees had applied for the grant to be issued to them, agreeably to the devise or "bequest" in the last will and testament of *Thomas Brooke,* and that the grantor had consented to make the grant accordingly. And it proceeds to state, that "therefore, in consideration thereof;" that is, in pursuance of such intent and agreement, the grantor did "give, grant and confirm unto the grantees, the aforesaid tracts or parcels of escheat land, now re-surveyed, with the vacancy added, reduced into one entire tract, and called *Nonesuch*, and bounded as follows," &c. If this grant had issued without the "*habendum*," could a serious doubt have been urged, but that it would have fully effectuated the design and intention of both the grantor and grantees; and that the tract of land called "*Nonesuch*," would

have vested in the grantees, agreeably to the recited clause in the last will and testament of *Thomas Brooke?* We think not. It matters not that it is given to the grantees, without any express words of inheritance. The terms used in the granting clause itself, sufficiently declare the intention of the grantor, to transfer to the grantees the same interests and estates in the lands granted, with which it was designed to invest them, by the last will and testament of *Thomas Brooke;* and whether such declared intent preceded or succeeded the words, give, grant, &c., our construction of this clause of the grant, would be in nowise changed thereby.

"The technical meaning of the word, premises, in a deed of conveyance, is every thing which precedes the *habendum;*" "and it is in the premises of a deed, that the thing is really granted." The premises of the grant before us, passing, as we conceive, the lands granted in conformity to the last will and testament of *Thomas Brooke,* and the declared intent of both grantor and grantees, the next enquiry to be answered is, has the *habendum* such controlling influence over the grant as to defeat the estates created by the premises, and substitute, in their places, entirely different estates, contrary to the manifest intent of the parties to the grant. According to our construction of the grant, made by the premises, it is in direct conflict with that contained in the *habendum.* Both cannot prevail. One must overrule the other. Which takes precedence, is the question? In our opinion, the limitation contained in the *habendum* must be rejected, and the estates given in the premises must prevail. In 2 *Lomax's Dig.,* 188, it is stated, that "where there are two clauses in a deed, of which the latter is contradictory to the former, there the former shall stand." And in page 215, of the same book, it is said, that "where the *habendum* is repugnant and contrary to the premises, it is void, and the grantee shall take the estate given in the premises. This is a consequence of the rule already stated, that deeds shall be construed most strongly against the grantor; therefore he shall not be allowed to contradict or retract, by any subsequent part of the deed, the gift made in the premises."

It follows from the views we have expressed, that we think the county court erred in granting the appellees prayer in the tenth bill of exceptions.

It is, we think, apparent, that the prayer of the defendant below, in the eleventh bill of exceptions, has not been correctly transcribed in the record transmitted to this court, it being, in a great measure, unintelligible. We, however, have no alternative but to assume, that the county court acted upon it in the form in which it appears before us; and, therefore, on account of its unintelligibility, properly rejected it.

We, also, concur with the county court in its refusal to grant the defendants prayer in the twelfth bill of exceptions, but for very different reasons from those which influenced the action of that tribunal. Under the act of 1825, ch. 117, the only point, decided by the court below, was the insufficiency of the cause assigned, in bar of the appellees right to recover. The prayer was, "that the plaintiffs cannot claim title to the lands in controversy, and maintain an action of ejectment for the same, in virtue of the grant from the *Lord Proprietary* to *Sarah Brooke, Walter Brooke*, and *Richard Brooke*, because said grant is repugnant to, and in violation of the express terms of the will of *Thomas Brooke*, and is a fraud upon his devisees." In responding to this prayer, the county court was bound to give its true construction to this grant, so far as concerns the objection urged against it. That construction, this court have said, so far from being repugnant to, is in perfect consonance with the will of *Thomas Brooke*, and is, consequently, no fraud upon his devisees. In this view of the question we must say, that the court below committed no error in its refusal of the appellants prayer in her twelfth bill of exceptions.

We concur with the county court in its rejection of the appellants prayers in the first, eleventh and twelfth bills of exceptions; but dissenting from its instruction to the jury in the second and third bills of exceptions, and from its overruling the appellants objections to the evidence offered in the fourth, fifth, sixth, seventh, eighth and ninth bills of exceptions, and from

its granting the appellees prayer in the tenth bill of exceptions, we reverse its judgment.

JUDGMENT REVERSED.