659 A.2d 347

**Nan J. BARCHOWSKY**

v.

**SILVER FARMS, INC. et al.**

**No. 1458, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 6, 1995.

---

Charles B. Keenan, Jr. (Paul W. Ishak and Stark and Keenan, on the brief), Bel Air, for appellant.

Michael E. Leaf and Robert S. McCord (Leaf, Mahoney and McCarthy, P.A., Bel Air and Richard C. Burch and Mudd, Harrison & Bruch, Towson, on the brief), for appellee.

Argued before SALMON and CATHELL, JJ., and JOHN J. GARRITY, Judge (retired), Specially Assigned.

GARRITY, Judge.

This matter concerns a boundary dispute involving a lane that runs between the properties of two neighboring farms in Harford County, near Aberdeen, Maryland.

## PROCEDURAL SUMMARY

On May 5, 1992, Nan Jay Barchowsky, appellant/cross appellee, filed a complaint for trespass and ejectment against Silver Farms, Inc., and Arthur and Marie Silver Coates, appellees/cross appellants, over a farm lane running between the properties of the parties. The defendants thereafter filed an answer and counter complaint against Ms. Barchowsky, the Maryland Environment Trust (MET),[1] Robert I. Callahan, and

---

1. MET did not participate in this litigation. It represented to the Court that it would amend the property description in the conservation easement in accordance with Barchowsky's property rights as determined by the court.

William B. Thompson,[2] seeking a declaratory judgment that those parties had no right, title, or interest in the lane.

On March 21, 1994, the Circuit Court for Harford County (Close, J.) granted partial relief to both parties. Although principally determining that Silver Farms, Inc., was vested with fee simple title to the farm lane, the court concluded that a technical trespass to Ms. Barchowsky's property had occurred, as a result of the location of a gate.

## BACKGROUND OF FACTS

For the past 185 years, the Jay family and the Silver family have been neighbors on adjoining farms. This dispute centers on Ms. Barchowsky's efforts to secure recognition from Silver Farms, Inc., of two points: (1) that the easterly boundary of her 83.96 acre farm corresponds to the center line of a lane known as Silver Lane (formerly known as Hoopman Mill Road or the Mill Road) that runs between her farm and the Silver Farms tract; and (2) that she and her successors have an easement by prescription over the remaining half of the lane in order to secure access to her cultivated farm fields from U.S. Route 40. For the last 63 years, four generations of farmers from the Osborn family have leased and farmed both the Jay and Silver fields that run along either side of the disputed lane. The Osborns gained access to both of these fields by way of this lane.

Both the Jay and the Silver farms originated from a larger tract of land acquired by Peter Hoopman in 1807. In 1809, Peter Hoopman (the great-great-great grandfather of appellee Marie Silver Coates) conveyed 165 acres of land to Frances Griffith, who later married a Jay. The 1809 deed did not mention the lane. The metes and bounds description of the Jay/Griffith tract included a call to a stone near the farmhouse, then continued "North 84 degrees East 72 perches to a stone...." The parties agree that the second stone, marking

---

**2.** Thompson and Callahan, who were represented by the same attorney and firm that represented Ms. Barchowsky, did not personally appear for trial and did not file an appeal.

the northeast corner of this tract, and therefore the easterly border of the property, cannot be found.

The lane originally ran from this second stone to Post Road but has since been shortened by the construction of the B & O Railroad, the Philadelphia, Wilmington and Baltimore Railroad, and U.S. Route 40. The first indication in the land records of the existence of the lane appeared in a deed by the Jays to John Hopper for 50 acres in 1849 (hereinafter referred to as the "Hopper deed"). The Hopper deed refers to the disputed lane as "Hoopman's Mill Road" and mentions that it intersected with the right of way of the Philadelphia, Wilmington and Baltimore Railroad.

In 1883, Jeremiah P. Silver and John Jay conveyed strips of their lands to the Baltimore and Ohio Railroad Company, as described by respective plats attached to the deeds. Both of these plats clearly evidenced the dividing line between what was then the Jay and Silver properties as being the center line of the lane.

Ms. Barchowsky has lived on and off the Jay/Griffith tract all of her life but made it her permanent residence in 1960 after the death of her aunt, from whom she inherited the property. In 1962, Ms. Barchowsky hired Frederick Ward and Associates (Ward) to conduct a survey of the property in order to determine its boundary lines.

Using the boundary description contained in the 1809 deed, Ward was unable to locate the second stone that was to mark the easterly boundary line. Having noted that the 1809 deed called for a line running 72 perches (which equates to 1,188 feet) from stone to stone but being unable to locate the second stone, he determined that the easterly portion of the Jay/Griffith tract was the center of Silver Lane, using the lane as a monument. The distance was thereby extended an additional 6.7 feet to 1,194.78 feet. In explaining the basis of extending the boundary line to the center of the lane, Ward stated:

> The only thing that we found was a fence post on the west side of this lane that we were discussing. And the distance was short of the 72 perches. And looking at all the evidence

we had, the railroad plats which called for the center line of the lane as the property line, the distances on the deed and the knowledge that historically, if there was a road very close to a property line, they usually used the center line of the road as the property line. The road is obviously old. I don't know when it was put in, but it had obviously been there for a long, long time prior to 1962. So utilizing the evidence we had available in 1962, it was my determination that the proper location of that easterly boundary of the Barchowsky's property was the center line of that lane.

Additionally, property line surveyor Vincent Nohe testified on behalf of Ms. Barchowsky. He placed the 1,188 foot point within 6.78 feet of the center of the lane, within the traveled portion of the present roadway, which was about 14 feet in width at the end of the 72 perch line.

Relying on the Ward survey, Ms. Barchowsky, in 1978, executed a deed to the MET conveying a conservation easement in the Jay/Griffith tract. Additionally, in 1985, she executed a deed to Callahan and Thompson conveying fee simple ownership to 2.82 acres, which included a portion of the lane in question.

Ms. Barchowsky and her husband testified that they have casually used Silver Lane for walking, riding horses, and gathering firewood, while using another road to gain access to their residence. Neither Ms. Barchowsky nor any of her predecessors in title have paid for maintenance of the gravel surface of Silver Lane.

Silver Farms, Inc., was incorporated in 1972. Its stock is owned by Arthur and Marie Silver Coates who are also officers of the corporation. The corporation owns Silver Farms, consisting of approximately 344 acres of land containing planted fields and a tree farming operation. In 1874, William S. Bowman was hired by the Silver family to conduct a survey of the Silver property. The Bowman survey concluded that the Silver property extended "to the West side of the Mill Road."

The Coateses testified that the Silver family has claimed fee simple ownership of the entire road bed of Silver Lane and that they have never acknowledged that the Jays/Barchowskys have any right, title, or interest in the lane.

M. Kirk Ritchie, a surveyor, testified on behalf of Silver Farms and opined that the easterly boundary of the Jays' property line runs near but to the westerly side of the gravel portion of Silver Lane, which he measured to vary in width from 9 to 11 feet. Ritchie stated that he had "no dispute with the measurements of the Ward survey. My difference of opinion is his opinion of the eastern property line [which in Ward's opinion went to the center of the lane] not his measurement of distances." He further testified:

Through lack of any other evidence, I would set the line at 1,188 feet from the stone found by the Barchowsky's house. That is what the deed (1809 deed) calls for. It doesn't call for a road. I would not extend it to a road.

. . . . .

There is a clearly defined order of definition of strength of boundary points. The most or the strongest boundary point to be used is the original documentation. The second strongest evidence in determining a boundary is the distance. The first strongest is not there. The stone does not exist.

In October of 1991, the Silver family erected a gate across Silver Lane to protect their property against intruders who had vandalized their farm machinery, timber equipment and buildings, stolen property, ridden motorcycles and four-wheel drive vehicles up and down the lane, and dumped trash there. For some time, the Osborns have been plowing snow off the lane and spraying weeds to prevent overgrowth, as a courtesy to both parties.

The matter at bar commenced after the installation by the Coateses of the gate across Silver Lane and the fact that a key to the gate lock was not provided to the Barchowskys, although access has been continuously provided to the Osborns to farm the Barchowsky fields. After the gate and lock were

installed, Ms. Barchowsky filed suit against Silver Farms, Inc., and the Coateses for trespass and ejectment, claiming compensatory and punitive damages.

The court's final judgment decreed:

(1) Defendants' Motion to Enforce Stipulation and Agreement regarding damages and Motion to Alter, Amend or Revise Judgment is hereby Granted.

(2) That neither the Plaintiff nor her predecessors in title acquired a right by prescriptive easement to use the lane in question.

(3) That neither the Plaintiff nor her predecessors in title acquired by adverse possession a right to use the lane in question.

(4) That the eastern boundary line of the Plaintiff's property is the west side of the lane in question.

(5) That the Defendant, Silver Farms, Inc., is vested with fee simple title to the farm lane in question.

(6) While the Court finds that a trespass and ejectment occurred, no damages will be awarded because of the stipulation and agreement of the parties as contained in the letter dated November 16, 1993, a copy of which was attached to Defendants' Motion referenced herein.

(7) That the Court denies that the Plaintiff has an easement to use the lane either by way of implication or presumption.

We are asked to determine:

1. Whether the circuit court correctly held that the easterly boundary of the Barchowsky parcel is to the west side of the disputed farm lane.

2. Whether the circuit court correctly held that Ms. Barchowsky did not establish a right to use the farm lane by prescriptive easement or by adverse possession.

3. Whether the circuit court erred in finding that a trespass and ejectment had occurred since Barchowsky failed to establish title to the farm lane and failed to establish the

specific location of the boundary line in question relative to the location of the gate post.

4. Whether the trial court correctly concluded that Barchowsky, who failed to prevail on the issue of ownership at trial, is barred from seeking or recovering damages because of the terms of a pretrial settlement agreement that required her to prevail on both the issues of liability and ownership at trial in order to receive the stipulated damage amount.

## DISCUSSION OF LAW
### I. THE BOUNDARY LINE

■ As to the location of the common boundary line, the trial judge succinctly observed that "this issue depends upon whether the Plaintiff's (Barchowsky's) easterly boundary line extends to the center of the farm lane or ends on the west side of the lane."

In ruling that the 1809 deed had priority over all subsequent deeds, including the Jay & Silver railroad deeds of 1883 that had recognized the boundary line to be the center of the lane, the trial judge found:

The 1809 deed clearly calls for a 72 perch line. Since the second stone cannot be found, the next strongest measurement for a surveyor to use is the distance line. As a result, it is almost irrelevant whether or not the second stone can be found or for that matter, when the road first appeared, because 72 perches equals 1,188 feet. Therefore, the Plaintiff's easterly boundary line ends on the west side of the farm lane.

Appellant Barchowsky takes issue with the court's premise of using the distance line as the strongest measurement because of the inability of surveyors to locate the second boundary stone. She asseverates that the trial judge should have first conducted an analysis of existing evidence to determine whether the position of the monument could be located with reasonable certainty before relying on a distance call.

The Coateses argue, on the other hand, that, since the original deed of 1809 clearly stated the course and distance (72 perches) from the still existing stone as the easterly boundary of the Jay tract, there is no need to refer to subsequent instruments in the chain of title of either parcel. While recognizing that the railroad right-of-way recorded subsequent to the original deed described the boundary of each parcel as being the center of the lane, they argue that such deeds executed subsequent to the 1809 deed could not establish or alter the location of the easterly boundary lane of the Jay–Barchowsky parcel.

In *Ski Roundtop v. Wagerman,* 79 Md.App. 357, 556 A.2d 1144 (1989), we held that subsequent deeds do not control the location of a boundary, and stated that a mistake in later instruments will not change the true boundary established by the earlier instrument in the absence of facts giving rise to an estoppel. Writing on our behalf, Judge Alpert looked to the original land patent to determine the location of the disputed boundary and observed:

> Any discussion of subsequent deeds is irrelevant. In the absence of facts giving rise to an estoppel, we decline to establish a rule of law that binds successors to real property to all descriptions of property made by their predecessors in prior deeds, particularly where the original patent contradicts such deeds. Moreover, one purporting to be an adjoining landowner should not be allowed to capitalize on such mistakes where the boundaries are correctly established by even earlier deeds or, in this case, earlier patents.

*Id.* at 365, 556 A.2d 1144.

As subsequent deeds may incorrectly reflect the intent of the original parties, we adhere to the longstanding rule that, in the absence of estoppel, a prior deed takes precedence over a subsequent deed in a dispute arising as to the boundary lines between adjoining tracts. *Bryan's Lessee v. Harvey,* 18 Md. 113 (1861). Indeed, the evidence in this case demonstrates that subsequent railroad deeds, surveyed by the railroads, and executed by the Jays and Silvers to the B & O are

inconsistent with the 1833 railroad deeds executed by the parties. Although some of the railroad deeds seem to support Ms. Barchowsky's claim, there are other railroad deeds that support the Coateses' position because they call to the westerly side of the lane as the boundary location rather than its center.

■ While it is true that there is a common law presumption that the grant of a parcel containing a call to a line binding on a public or private road, alley, street, or highway is presumed to carry title to the center of the roadway, the presumption is rebuttable, and it is the description in the original deed that controls. The common law presumption was modified and codified by the Maryland General Assembly in 1892 and is now found in Maryland Code (1974, 1988 Repl.Vol.), § 2–114 of the Real Property Article. The Maryland cases, however, make it clear that the statutory presumption cannot be applied to conveyances made prior to its passage. *Arcadia Inv. Corp. v. Crown Cork & Seal Co.*, 190 Md. 106, 57 A.2d 285 (1948). Under the vestige of the common law presumption applicable to deeds that predate 1892, the issue of whether title goes to the center of the street must be determined by the terms of the instrument. *Rieman v. Baltimore Belt R. Co.*, 81 Md. 68, 31 A. 444 (1895). The *Rieman* court construed a deed as not passing title to the center of the road where the description began at the side of a street and stated, "Where one end of a line is fixed on the side of a highway, no rule of construction known to us will justify the location of the other end of that line in the center of it." *Rieman*, 81 Md. at 79, 31 A. 444. The court refused to construe the grant as conveying a triangular strip from the center of the road at one end to the side of the road at the other.

■ It is clear that a decision of a trial judge, sitting without a jury, that resolves a boundary line dispute, is not to be disturbed unless clearly erroneous. *Rosier v. Vandevander*, 230 Md. 266, 186 A.2d 615 (1962). In this matter, the trial judge found that the intent of the original parties was to

establish the easterly boundary of the Jay Tract 72 perches (1,188 feet) from the first stone. As there was not a scintilla of evidence establishing the existence of a farm lane dividing the Jay and Silver Tracts when the deed was executed in 1809, the common law presumption does not apply. We are unable to conclude that the trial court was clearly erroneous in its finding as to the intent of the original parties.

 As a general canon of boundary law, it is well-settled that calls to monuments control if they can be established and that, where a monument called for in a deed is missing, the second priority is the course and distance. *Dundalk Holding Company v. Easter,* 195 Md. 488, 73 A.2d 877 (1950). There is no dispute that the stone at the end of the 72 perch line called for in the original deed is missing. Based on this undisputed fact, together with the trial court's finding of the original intent of the parties, which we deem to be reasonable, we hold that the trial court correctly concluded that Ms. Barchowsky's easterly boundary line ends on the west side of the Silver Lane.

## II. *TITLE BY ADVERSE POSSESSION OR EASEMENT BY PRESCRIPTION*

The trial court denied Ms. Barchowsky's claim to a right to use the lane by virtue of an easement by prescription or by title through adverse possession. The court found that Ms. Barchowsky only used the farm lane occasionally for walking, riding, picking up branches, or chasing away trespassers; that the Osborn family, who farmed the adjacent parcels on behalf of both parties, had impliedly been given permission by the Silver family to transport farm machinery over the lane to reach the Jay fields; and that mere reliance upon the 1962 Ward survey to support her ownership of the land was insufficient to ripen into a claim under color of title.

Ms. Barchowsky asseverates that the trial court was clearly erroneous in its findings of fact, as the 1930 letters between B.H. Silver and C.B. Osborn, contrary to the court's finding, did not refer to permission to use the lane; that some items of

farming equipment used by the Osborns, such as the corn planter and combine, were more than 15 feet in width and of necessity traversed over both parcels; that the disputed lane was the sole agricultural access for both the Jay/Barchowsky and the Silver–Coates farm fields and was used by both parties almost exclusively for that purpose; that she did not rely upon the 1962 Ward survey for the purpose of establishing a prescriptive easement; and that the evidence had established a reciprocal prescriptive easement on the basis of mutual use by both parties for nearly two centuries.[3]

As we explained in *Miceli v. Foley*, 83 Md.App. 541, 552, 575 A.2d 1249 (1990), in order to establish title by adverse possession, a claimant must show continuous possession of the property for 20 years in an actual, open, notorious, exclusive, and hostile manner, under claim of title or ownership. In other words, the claimant has the burden of establishing title by adverse possession based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent. *Miceli* at 552, 575 A.2d 1249.

The mere occasional use of land does not give rise to title. Ms. Barchowsky must prove that she engaged in unequivocal acts of ownership inconsistent with the rights of the Coateses. The trial judge found that the occasional use of the lane by the appellant for walking, horseback riding by her daughter, or picking up branches and chasing off trespassers, were insufficient acts to give rise to title as such activities did not constitute a regular, exclusive, open, and notorious use. We believe that the trial court's finding in this regard was not clearly erroneous.

Ms. Barchowsky strongly disputes the finding by the trial judge that the Osborns, to whom both families had leased their farmland, had been given permission by B.H. Silver to

---

3. As the theory of reciprocal easement, raised by Ms. Barchowsky for the first time on appeal, was not decided by the trial court, we will not review the point. Md.Rule 8–131(a). We note, however, that our preclusion would not prevent the parties from entering into an easement agreement for their mutual benefit.

use the farm lane as indicated in certain letters dated in 1930. Although the letter from B.H. Silver did not specifically refer to the lane, it indicated an agreement to allow the Osborns to farm the Silver fields, to protect the farm against trespassers, "and enjoy the gunning if that keeps the poachers off." B.H. Silver also granted Osborn the right to prosecute anyone violating the trespass notices on any part of the farm. It is clear to us that the trial court correctly determined that the Coateses had produced sufficient evidence that their predecessors had given express permission to the Osborns to farm the Silver land, which carried with it the right to use the lane.

The evidence clearly established that the Osborn family had used a small portion of the lane seasonally to access both the Jay/Barchowskys and the Silver Farm for as long as any of the parties or witnesses could recall. In this regard, the trial court determined that "the Silver family impliedly gave the Osborns permission to transport their equipment over the lane to the Jay fields by the fact that they have not tried to prevent this use for 73 years." We do not believe that the trial court's finding in this regard was clearly erroneous.

As to the right to use the lane by virtue of an easement by prescription, such an easement may be obtained if a claimant proves by a preponderance of evidence that he or she has continuously and uninterruptedly used the lane for more than 20 years under color of title or claim of right without permission. *Furman E. Hendrix, Inc. v. Hanna*, 250 Md. 443, 243 A.2d 600 (1968).

The factual and legal analyses are similar to the evaluation of Ms. Barchowsky's adverse possession claim. We believe that her use of the lane was correctly evaluated by the trial judge to be occasional and permissive. Based on the facts and circumstances of this case, we are unable to conclude that the trial judge erred in denying Ms. Barchowsky a right of easement by prescription.

### III. *TRESPASS AND EJECTMENT*

The trial judge found that the gate, erected by the Coateses, extended onto Ms. Barchowsky's land, and that a

trespass and ejectment to her property had occurred. While noting that intent was not an element of a trespass, the trial judge recognized that, rather than placing the gate across the lane in order to interfere with Ms. Barchowsky's property rights, the Silver family's purpose for installing the gate was to keep out trespassers and vandals who had destroyed their timber and farm equipment as well as some of their buildings. "More importantly," the trial judge observed, "the Silvers were not trying to prevent the Plaintiff from access to her fields because the Osborns had a key to the gate and could therefore access either field." The court further stated that any damage to the Barchowsky property was nominal.

Silver Farms, Inc., and the Coateses contest the court's finding of trespass and ejectment. They point out, in accordance with the holding in *Horning v. Hardy*, 36 Md.App. 419, 373 A.2d 1273 (1977), that Ms. Barchowsky must recover on the strength of her own title or possessory interest, and that she failed to show any possessory interest in the land alleged to have been trespassed. We disagree.

In addition to photographs clearly depicting a wide gate and guy wires that extended beyond the width of the road surface, which was approximately ten and one half feet at that point, and into a drainage ditch, the 1809 deed clearly called for a 72 perch line from the first stone that all parties agreed had been located.

Based upon the 1809 deed, the trial judge determined that the eastern boundary line of the Barchowsky property, which it found to be located 72 perches (1,188 feet) from the first stone, "is the west side of the lane." Thus, if the gate or its supporting guy wires, or the gravel on the road, extend beyond the west side of the lane as so located, a trespass and ejectment occurred. Based upon the surveys and the photographs, we hold that the trial court had sufficient evidence to so conclude.

## IV. *AGREEMENT AS TO DAMAGES*

The trial court determined that, although it found that a trespass and ejectment had occurred to the Barchowsky

property, it would not award damages "because of the stipulation and agreement of the parties as contained in the letter dated November 16, 1993."

Prior to trial, the court was advised:

The parties have stipulated and agreed to submit to the Court the issue regarding title to Silver Lane and the issue of right to use it so that Your Honor may make a ruling on that issue. This is the only issue that's going to be presented in this part of the proceedings. We won't be presenting evidence or argument concerning damages. That will simply be handled depending on how Your Honor rules on the ownership and right to use the lane.

The agreement as to damages was included in a letter of November 16, 1993 from Richard C. Burch, Esquire, an attorney for the Coateses and Silver Farms, Inc. The letter provided:

This correspondence follows our telephone conversation of earlier this afternoon regarding the resolution of the "damage" claims asserted by Ms. Barchowsky against Mr. and Mrs. Coates and Silver Farms, Inc. in the captioned litigation.

It was agreed that in the event that the court finds in favor of Mrs. Barchowsky in either the trespass or ejectment claim and determines that Ms. Barchowsky's property line extends to the middle of the subject lane as claimed by her, the insurance carrier for Mr. and Mrs. Coates and Silver Farms, Inc. will pay the total sum of $4,300.00 in full and final settlement, satisfaction and release of any and all damages (including consequential and punitive), claims and demands of every nature and kind she may have against the Coateses and/or Silver Farms, Inc. arising from or relating to the construction and erection of the gate on the subject lane and the unwillingness of the Coateses and Silver Farms to provide Ms. Barchowsky with a key to the gate lock. If, of course, the Coateses elect to appeal any adverse decision on liability, the obligation for payment by the insurance

carrier will be held in abeyance pending the final resolution of the appeal.

In the event that your client does not prevail on the issues of liability and ownership and/or the Coateses and Silver Farms, Inc. do prevail, no payment will be made to your client; unless, of course, she ultimately prevails on the issues regarding liability and ownership following any appeal which may be pursued by her (in which event the payment would be made to her).

We have further agreed that Judge Close is not to be made aware of this 'stipulation and agreement' regarding the 'damage' aspect of the case so that he is not prejudiced one way or the other as he hears and resolves the primary issues relating to liability and ownership. He will simply be advised to resolve the issues of liability and ownership. He will not have to consider the issue of damages; nor will you offer any evidence, testimony or argument relating to damages.

I have spoken with Mr. Leaf and he and the Coateses have authorized and approved this resolution regarding damages. In view of the agreement set forth herein, I will not participate further in the trial of this matter which is set to begin tomorrow.

Ms. Barchowsky argues that the settlement agreement was conditioned on dual findings, and that, as the court determined that her property line extended only to the west side of the lane, rather than to its center, the necessary dual findings for the agreement to become operative had not occurred. Thus, she argues, the settlement agreement is a nullity and that she is entitled to a jury trial on the issue of damages. We see it differently.

Maryland follows the objective theory of contract interpretation. That theory holds that "contractual intent is determined in accordance with what a reasonable person in the position of the parties at the time of the agreement would have intended by the language used." *Faulkner v. American Cas. Co. of Reading,* 85 Md.App. 595, 605–606, 584 A.2d 734,

*cert. denied,* 323 Md. 1, 590 A.2d 158 (1991); *Bernstein v. Kapneck,* 290 Md. 452, 430 A.2d 602 (1981).

The Coateses argue that the settlement agreement was designed to remove the issue of any and all damages from the case. They point out that it provided that the trial judge "will not have to consider the issue of damages" and that Ms. Barchowsky will not have to "offer any evidence testimony or argument relating to damages."

The benefit to the parties in entering into an agreement resolving the damage claim is obvious. Ms. Barchowsky did not have to introduce any evidence on the issue of damages, thus saving attorney's fees in preparing for the damage issues, court time in presenting the issues, and, possibly, the cost of expert witnesses verifying the damages. Moreover, Ms. Barchowsky guaranteed herself a sum certain if a court finally determined that she owned to the center of the lane and that the Coateses had trespassed. This was particularly valuable to Ms. Barchowsky because the Coateses disputed her right to recover any damages. The Coateses agreed that they benefitted in a similar way: they did not have to pay an attorney to prepare for and try the damage issues, and they limited their liability exposure to a sum certain.

It is clear to us that the settlement agreement was a mutually beneficial compromise, and one that is favored by the judicial system. *See Bernstein v. Kapneck,* 290 Md. 452, 459, 430 A.2d 602 (1981) ("particularly in this era of burgeoning litigation, compromise and settlement of disputes outside of the court is to be encouraged and, thus, the settlement agreement evidencing accord and satisfaction is a jural act of exalted significance which without binding durability would render the compromise of disputes superfluous"); *see also David v. Warwell,* 86 Md.App. 306, 309–312, 586 A.2d 775 (1991) (discussing public policy behind the settlement agreements). It is also evident that the settlement agreement, by its own terms, was designed and did, in fact, resolve all damage issues between the parties.

As did the trial judge, we believe that the settlement agreement is clear and unambiguous. The Coateses agreed to pay Ms. Barchowsky $4,300 in full and final settlement, satisfaction and release of any and all damages, in the event that the trial court found in her favor on either the trespass or ejectment claim *and* determined that the Barchowsky property line extended to the middle of the farm lane as she had claimed throughout the litigation. Although the trial judge found that a technical trespass had occurred, he did not find that the Barchowsky property line extended to the center of the lane. In closing, the trial judge stated, "It is the opinion of this Court that if the gate or the gravel on the road extends onto the Plaintiff's land, then the Defendants will remove these obstacles, as they already agreed to do at trial."

We hold that the trial court was not clearly erroneous in concluding that under the terms of the stipulation and agreement of the parties, no damages should be awarded to either party.

JUDGMENT AFFIRMED.

APPELLANT/CROSS–APPELLEE TO PAY TWO–THIRDS OF COSTS; APPELLEES/CROSS–APPELLANTS TO PAY ONE–THIRD OF COSTS.