682

694 A.2d 509

William C. MILLAR, Trustee of the William C. Millar Trust

v.

C. Keating BOWIE et ux.

No. 1454, Sept.Term, 1996.

Court of Special Appeals of Maryland.

June 2, 1997.

Richard A. DeTar and David R. Thompson (Miles & Stockbridge, P.C. and Cowdrey, Thompson & Karsten, on the brief), Easton, for Appellant.

Willard C. Parker, II (John G. Ong and Wheeler, Thompson, Parker & Counts, on the brief), Easton, for Appellees.

Argued before CATHELL and SONNER, JJ., and PATRICK L. WOODWARD, J. (Specially Assigned).

CATHELL, Judge.

William C. Millar, Trustee of the William C. Millar Trust, appeals from a judgment of the Circuit Court for Talbot County (Horne, J., presiding) that set a boundary line between his property (the "Eastern Parcel"), and the property of C. Keating and Alice F. Bowie, appellees, (the "Western Parcel") of what formerly was known as "Evergreen Farm." Appellant presents several issues:

1. Whether a deed which describes a boundary line by reference to a monument (i.e., an "old fence line") requires resort to extrinsic evidence to determine the location of the boundary line[.][1]

2. Whether the Trial Court may ignore language in a deed which describes the boundary line by reference to a monument because the Trial Court believes other language in the deed more clearly describes the location of the boundary line[.]

3. Assuming *arguendo* that the description of the boundary line in the Bowies' Deed requires resort to extrinsic evidence to locate the monument (i.e., the old fence line), whether the Trial Court erred as a matter of law when it failed to consider a plat, depicting an angled old fence line between the properties, which was incorporated by

---

1. We attach hereto a copy of a portion of a map prepared in 1989 or later. We furnish it only to indicate that appellant contends that the boundary line is shown by the line we have identified on the map as angled "old fence line" and that appellees contended below and the trial court found that the boundary line is that line we have indicated by referring to it as "continuing in the same straight line." We have relocated the directional arrow for reference purposes. We emphasize that during the operative period in January of 1961, there were no metes and bounds descriptions. They were added in the 1989 map.

reference into the contract of sale by which the Bowies acquired their property[.]

4. Whether it was an abuse of discretion that the Trial Court did not factually determine that the boundary line is angled when the extrinsic evidence was uncontroverted that historically there was an angled old fence located in between the Eastern and Western Parcels[.]

Under the circumstances of the case *sub judice,* the answer to question number one is no. We answer question two by noting that Judge Horne did not ignore the deed language; he rejected it as not creating the type of ambiguity that made it directly relevant to the final disposition. Moreover, Judge Horne found that the operative language, "continuing in the *same* straight line" (emphasis added), clearly described the boundary line, *i.e.,* was not ambiguous in the first instance. As to question number two, Judge Horne was not clearly erroneous—in fact, we perceive that he was correct. As to questions three and four, we see no need to assume anything *arguendo.* Initially, it was not the Bowies' deed that established the boundary line. It is the Jean Koehn deed that is the senior deed, i.e., the deed that controls. The Bowies' deed is essentially irrelevant to the establishment of the boundary. *See Ski Roundtop, Inc. v. Wagerman,* 79 Md.App. 357, 365, 556 A.2d 1144 (1989) ("Any discussion of subsequent deeds is irrelevant.") Moreover, our response to appellant's first two issues and our affirmance of the trial court for those reasons makes it unnecessary to resolve questions three and four. We note, however, that in our discussion and resolution of issues one and two, we will address, to some extent, questions three and four.

Periodically, as we discuss the facts, we will assess the trial court's factual findings. We may, in our holding, on occasion, repeat that assessment.

Appellant's title to the property at issue was derived from

Jean W. Koehn,[2] who, as a result of marital difficulties between her and C. Campbell Koehn Sr., obtained title to the tract through a deed that divided Evergreen Farm. This deed to her (the Jean Koehn deed), the senior deed at issue here, was executed and recorded in January of 1961. It provided a description that read:

BEGINNING on the Northwesterly side of the main driveway at the Southerly end of a concrete abutment erected over the causeway in said driveway and [1] running thence with the Northwesterly side of said driveway and a hedgerow in a Southwesterly direction and *in a straight line* to a point at the Southerly end of said driveway and the Southwesterly side of the barn road;[3] [2] *thence continuing in the same straight line* and with an old fence line between the park woods and the reserved land of the Grantors *to the top of the bank along the shore line of Island Creek;* thence at right angles to the shore line of Island Creek in a Southerly direction to the mean-low-water line of Island Creek; thence up and with the meanderings of the mean-low-water line of Island Creek and a cove thereof to the Southerly end of the Southeasterly concrete abutment over the above-mentioned causeway; thence in a Northwesterly direction across the main driveway to the point of beginning; *SUBJECT, HOWEVER,* to a right of way for purposes of ingress and egress to the barn road over that part of the main driveway included in the outline of the above conveyance. [Emphasis added.]

Subsequent to the January 1961 conveyance to Jean Koehn that partitioned Evergreen Farm, C. Campbell Koehn Sr. proposed to sell the remainder of Evergreen Farm. A real estate agent, Mr. Bartlett, knowing that the farm was for sale, made arrangements for appellees to view the property on the

---

**2.** Jean Koehn subsequently remarried a Mr. Shannahan. She is sometimes referred to as Ms. Shannahan or Jean Shannahan.

**3.** This point on the "barn road" has the characteristics of a "monument." It was extant in 1961. There is no dispute that it then existed or as to its location.

23rd day of September 1961. Prior to that time, but after the January 1961 partitioning of the farm, the real estate agent met with C. Campbell Koehn's attorney, with Thomas Critchlow, apparently a co-listing broker of the property, and with a surveyor, Mr. Kastenhuber, at the farm to view the property. Neither appellees' nor appellant's predecessor was present at this meeting.

At this meeting, eight months after appellant's tract had been conveyed to Jean Koehn, and outside her presence, the surveyor, Kastenhuber, apparently suggested that a "new" boundary line be established by using an old fence line. This fence line is later described as the "angled" fence line. There is no indication that at this meeting there was any discussion of the Jean Koehn deed or its description of the boundary as "a straight line" and "in the same straight line." There is also little indication that Kastenhuber was, at that time, aware of the Jean Koehn deed. On the 23rd and 24th of September, appellees visited the property and, on the 24th, offered to purchase it.

Appellees then purchased the property of C. Campbell Koehn, the Western Parcel or remainder of Evergreen Farm. The contract of sale referred to an older plat dated 1919, that appellant asserts on appeal "contains an angled line drawn between the Eastern Parcel and the Western Parcel." Firstly, that is simply incorrect. In 1919, there was not yet a Western or Eastern Parcel. The survey, as prepared, and as the trial judge found, had no "angled line." The survey itself is a blueprint, i.e., white paper with blue lines. Someone has added to that white-on-blue survey a yellow line and called it a "Fence" and also has shown on it in yellow the outlines of a "Barn Road." In the absence of any sufficient evidence explaining the affixing of the yellow lines to the 1919 survey, the trial judge found:

> The 1919 plat, which necessarily was prepared before the partition of the properties, has been altered. A boundary line that is marked "fence" has been drawn onto the plat

with a yellow-colored pencil. [As a result,] [t]he boundary line angles in a more westerly direction. . . .

Judge Horne later found as to the 1919 plat:

The plat has been altered: an angled boundary line has been added with a yellow-colored pencil. . . . But for the penciled-in division line, the 1919 plat would be unilluminating with respect to the correct location of the boundary line.

The Court declines to rely on this altered plat for two reasons. First, the evidence as to whether the September 23, 1961, contract refers to the *altered* plat—the one that features the penciled-in boundary line—is equivocal. While Mr. Bartlett stated that he observed a November 1919 plat, which depicted an angled fence line, when the contract was executed, Plaintiff [appellee] testified that he never saw the plat. The plat that is referenced in the contract could easily be the November 1919 plat of "Evergreen Farm" *before* it was partitioned [in 1961].

We hold that the trial court was correct in declining to attribute much value to the altered 1919 plat. First, the property was not divided until 1961 and, thus, the 1919 plat is merely a map of the entire tract. The only facts adduced below support an inference that the yellow line was added to the map at the time of the September 1961 on-site discussion of a "new" division line. At oral argument, all parties conceded that the yellow line was not placed on that 1919 plat in 1919 but was added at some point thereafter, probably during the September 1961 event. However, by September of 1961, it was too late for the creation of a "new" division line. The division line had been created in January of that year by the Jean Koehn deed.

Ultimately, on January 31, 1962, more than a year after the division of Evergreen Farm, a deed was executed and recorded in favor of appellees that described all of Evergreen Farm but excepted that part of Evergreen Farm previously conveyed to Jean Koehn. We, therefore, shall be primarily required to assess the trial court's construction of the Jean

Koehn deed and the court's application of the relevant and proper facts in its construction.

In a somewhat bizarre turn of events, Millar, the successor to Jean Koehn, argues in favor of Kastenhuber's creation of a "new" division line, which is shown in two plats drafted by him in 1961 showing an angled line between the two properties. The Bowies, on the other hand, the successors in interest to C. Campbell Koehn Sr., the potential (and ultimate) buyers at the time of the preparation of Kastenhuber's plats, argue that, because their deed excludes the tract conveyed by the Jean Koehn deed, Millar's deed controls. But that is of little moment to the job before us. What is penultimately clear is that there was but one instrument construed below, and one that we will construe here—the January 1961 deed to Jean Koehn. There is absolutely no conflict (nor could there be) between that deed and the January 31, 1962 deed to the Bowies. They are, by their very nature, completely compatible.

■ The dispute is (1) whether the language of the Jean Koehn deed is sufficiently clear and definite to convey an exact parcel without reference to other evidence; (2) can subsequent instruments be used to explain prior instruments; and (3) if so, do the two 1961 Kastenhuber plats take priority, or explain, the language of the Jean Koehn deed. In addressing the trial court's resolution of these issues, we shall touch upon the issues of senior/junior priorities, the clear/ambiguous dichotomy, fences and/or old fence lines, calls and priorities, and the use of reverse courses.

We initially note the standard of our review of a trial court's findings in cases such as this, which are largely fact dependent. We recently stated in *Barchowsky v. Silver Farms, Inc.,* 105 Md.App. 228, 239, 659 A.2d 347 (1995), that "[i]t is clear that a decision of a trial judge, sitting without a jury, that resolves a boundary line dispute, is not to be disturbed unless clearly erroneous."

We next note that there is apparently no dispute below that the stone monument found by Kane in 1993 had been placed

on the property on, or after, September of 1961 by Kastenhuber, in an effort to create the "new" division line. At least there is no evidence that it was placed at the time of the 1919 plat, as that plat does not indicate any monument. On appeal, no argument was presented that the monument had been placed prior to the January 1961 Jean Koehn deed or that it was placed as a part of the January 1961 division of Evergreen Farm. In *Zawatsky Constr. Co. v. Feldman Dev. Corp.*, 203 Md. 182, 186–87, 100 A.2d 269 (1953), one of the issues concerned monuments not mentioned in the deed description but used by a subsequent surveyor to establish a point of beginning. As to the surveyor's reliance upon the monument, the Court stated:

> But it is not safe to assume, without sufficient proof, that a monument which is not mentioned in the description of a tract is the beginning of one of the boundary lines of the tract, and then run the line based upon that assumption. . . . "It would enable the owner . . . to fix the boundaries of his own property for the benefit of himself . . . if he could plant a stone where he pleased, call it 'a boundary' . . . and then when he is dead have his son testify to such facts . . ., without any explanation as to who planted the stone, or by what authority it was done."
>
> It is recognized that where there are conflicting surveys, the problem before the court is fundamentally one of fact, inasmuch as the general rules as to preferences *are merely guides* for ascertaining the intention of the parties. Thus, while it is a general rule that calls in a deed ordinarily prevail over courses and distances, this rule is not applied if it defeats the manifest intention of the parties. [Citations omitted; emphasis added.]

We recently noted in *Barchowsky*, 105 Md.App. at 238, 659 A.2d 347, that:

> As subsequent deeds may incorrectly reflect the intent of the original parties, we adhere to the longstanding rule that, in the absence of estoppel, a prior deed takes precedence over a subsequent deed in a dispute arising as to the boundary lines between adjoining tracts.

Also noteworthy is *Tidler v. City of New Carrollton*, 59 Md.App. 23, 28, 474 A.2d 534, *cert. denied*, 300 Md. 154, 476 A.2d 722, 723 (1984), in which we noted:

> [B]oth parties' predecessors in title derived their interests in Lot 3 from a common grantor. Where contending innocent parties derive title of adjoining tracts from a common grantor by successive mesne conveyances and a shortage develops, the one claiming under the common grantor's first deed is not required to contribute to the shortage....

*See also Delphey v. Savage*, 227 Md. 373, 379, 177 A.2d 249 (1962) ("In the case now before us the conveyances by the common grantor ... were made before any subdivision plan ... so that [they] must be satisfied first.").

Likewise, in *Bryan v. Harvey*, 18 Md. 113, 128–30 (1861), the Court of Appeals stated:

> "*Elk Garden*," and also the land conveyed to the plaintiff, belonged to the common grantors of these parties, at the date of the first deed, and it was the plaintiff's own fault to have taken a subsequent deed for land covered, in part, by the "*Elk Garden*" patent, without having had the lines of "*Elk Garden*" laid down so as to have known how much of "*Elysiansylvania*" was clear of the elder tract. Disputes often arise out of conflict between the lines of different tracts, but it was never held, as far as we are informed, that the junior title must have precedence....
>
> ....
>
> ... It is well settled that where such is the case, and the first deed conveys by metes and bounds, or by what is an equivalent description, it must have precedence over a subsequent purchase. The case of *Mundell v. Perry*, 2 G. & J. 193 [ (Md.1830) ], is much like the present, and is conclusive on this question.... It is upon the same principle that a senior patent is entitled to priority over a junior one....

This is in accord with the Texas case of *Hill v. Whiteside*, 749 S.W.2d 144, 151 (Tex.Ct.App.1988), in which the court opined "when the senior survey can be easily identified, a junior survey cannot be made to control the senior survey."

In the case *sub judice*, the only relevant "intentions of the parties" were the intentions of Jean Koehn and C. Campbell Koehn Sr. when they divided their property in January 1961. The fact that Kastenhuber, Bartlett, and others thereafter met on the site and discussed where they thought the line went (and may have made yellow penciled free hand marks on a 1919 plat in respect to it) has little relevance to the previous intentions of the Koehns. The deed to Jean Koehn carved her parcel out of the greater whole. Thereafter, the remainder was conveyed by a deed of the greater whole over a year later to appellees. That deed excepted the parcel previously conveyed by the Jean Koehn deed. This is not an uncommon way for property to be conveyed. There is, therefore, no conflict between the respective instruments. In the present case, the deed to Jean Koehn is clearly the senior instrument. The only deed to examine is the Jean Koehn deed. We now examine the language in that deed.

In the first instance, we agree with Judge Horne that the language as to the direction of the course at issue is clear and unambiguous. If the description in the Jean Koehn deed had read "in a straight line with the fence line," then it may have been ambiguous. However, the deed provided that the line went along a course with the road in a straight line and then continued "in the *same* straight line . . . to the top of the bank along the shore line. . . ." (Emphasis added.) That language refers back to the previous course's straight line and is the imperative call; it is thus unambiguous, and the added language, "with a fence line," "between the park woods and the reserved land" is to be interpreted under this specific circumstance as referring to the line as being "generally" with a fence line.

12 Am Jur.2d *Boundaries* § 56 (1964) provides:

[W]hen a description of the boundaries of land calls for a line from one monument to another, the law presumes that a straight line is intended; and a line which is marked for only part of a required distance should be followed in the same direction for the whole distance unless there is some marked corner to divert it. [Footnotes omitted.]

The point where the first course became the second course in the Jean Koehn deed was at the southerly end of the driveway and the southwesterly side of the "barn road." That point on the barn road was itself a monument. That monument clearly was not intended as a corner but as the monument marking the continuation of the same straight line as the previous course.

The primary "call" in the course at issue was from a point on the southwesterly edge of the barn road "in the same straight line" as the previous course "to the top of the bank along the shore line of Island Creek." The next call was *to* the top of the bank of the shore line of the creek. In *Budd v. Brooke*, 3 Gill 198, 221 (Md.1845), one of the descriptions at issue said as a course "running east north east up [a creek], for breadth the length of two hundred perches to a marked oak." Although the Court eventually held otherwise, based upon the specific facts of the case, it nevertheless discussed the relevant law:

> Allanson's Folly is described in the patent as ". . . running east north east up Chincomuxon, for breadth the length of two hundred perches to a marked oak." Had no other more binding expression in relation to this line been used in the patent, the line must be run in a straight direction from boundary to boundary; the words, "running up a creek," not being a binding call, but merely indicating the general direction of the line referred to.

*Id.* at 221–22. The language "with a fence line" is controlled by the specific language "continuing in the *same* straight line" (emphasis added), and, likewise, as we see it, refers merely to the general direction of the course and does not substitute the fence line (which apparently may not have then existed in any event) for "the same straight line."

We shall digress for a moment to discuss the two plats prepared in 1961 by Kastenhuber. There is what appears to be a final 1961 map (Joint Exhibit No. 2) and a working or preliminary map from which the final map was prepared (Def. Exhibit No. 9). Neither of these maps was ever recorded, nor

was either one of them referred to in the Bowies' deed. Moreover, they had not even been prepared, or even been commenced, at the time of the January 1961 division of Evergreen Farm. A comparison of these preliminary and final maps reveals an interesting omission on the final one. On the preliminary map, the course identified in the Jean Koehn deed as the straight line, *i.e.*, the previous straight line course that "the *same* straight line" language refers to, shows, very explicitly, that all along that referenced (the first) straight line course there was a fence and hedgerow and, moreover, that the first course line proceeds some forty feet past the southwesterly line of the barn road, the monument, to which the Jean Koehn deed refers. However, on the final plat prepared by Kastenhuber, the language about the fence along the first course is omitted. Anyone, therefore, referring only to the final map would not know that there was an old fence line all along the previous-referenced course, to which the following course could refer.

Moreover, the 1961 plats' beginning points are considerably at variance with the beginning point described in the Jean Koehn deed. The initial point identified in the 1961 plat is approximately due *north* across the roadway from the southern point of the southeastern culvert. The *senior* deed, the Jean Koehn deed, called for the beginning point to be *northwest* across the road from the southern end of the same southeastern culvert. The first course in the deed—the course over which there is no dispute—called for it to be "to a point at the southerly end of said driveway and the southwesterly side of the barn road." The concrete monument, apparently placed by Kastenhuber in 1961 as the beginning point for the next course, is considerably southwest of the beginning point for that course named in the deed. The surveyor described this distance as "30 to 40 feet" beyond the barn road. At oral argument, appellant proffered that Kastenhuber placed the monument at that point because it was where the old fence line slanted away from the prior course of the fence line.

Furthermore, as we have said, the prior course was also along a fence line and hedgerow, as can be clearly seen from the draft prepared by Kastenhuber prior to his final, yet unrecorded, 1961 map. The early draft indicates that the entire first course was along a fence (even at one point indicating that the hedge was 1.5 feet from the fence). The final, but unrecorded 1961 map, omitted any reference to a fence along that first course and inserted the words "Hedge Row" that were not on the draft map.

When the Jean Koehn deed described its second course, it had already run one course in a straight line along a fence row. When its description of the second course states: "thence continuing in the same straight line and with an old fence line" it actually runs in the same line and along the same fence line for another "30 to 40 feet" under all interpretations. (Kastenhuber's maps indicate that in September of 1961, the old fence line did not slant away from the previous course until that point.) It describes the running of the entire line as "in the *same* straight line ... to the top of the bank along the shore line of Island Creek." (Emphasis added.) The deed description confines the first two courses to the same straight line. There may have been, at the time of the Jean Koehn deed, for the first thirty to forty feet, indications that remnants of an old fence line actually ran along that portion of the second "same straight line." Moreover, there is no indication that the line (the first and second courses) was to meander. We perceive that the call to the first thirty to forty feet of the course as being "in the same straight line" fixed the direction of that line even under Kastenhuber's version. There is *absolutely* no indication in the Jean Koehn deed that there was to be any change in direction at a point thirty to forty feet past the barn road. There is no indication whatsoever that the narration of a "same straight line" was anything other than a continuation of course. That language specifically confirms a continuation of the prior course. It states explicitly, "thence *continuing* in the same straight line." (Emphasis added.) At all intended changes of course, the deed provides without qualification "thence with," "thence *at right angles*,"

"thence *up and with the meanderings*," "thence *in a North-westerly* direction*.*" (Emphasis added.) It is clear that where the grantor wanted a change of course, he knew how to clearly state it. It is equally clear that when he wanted a course to continue, he also knew how to state it—and did. The language "between the park woods and the reserved land of the Grantors" is, under the circumstances here present, merely a general description of the area.

■ We are acutely aware that the Jean Koehn deed predated all of the 1961 mapping by Kastenhuber and, in fact, the Bowies' deed. It is the senior instrument. The subsequent maps, given the inconsistencies between the map and the deed description, support appellees' position, and are themselves, by reason of the departure from the courses and beginning points of the deed description suspect—even were they to be the senior document.

In *United States v. Gallas,* 269 F.Supp. 141, 144 (D.Md. 1967), the disputed language in the deed there at issue stated: *"[S]aid point being S 76° 37' W 797.4 feet from a post set in the Southeast corner of the property of the Grantor...."* (Emphasis added.) After discussing the order of priorities between natural and artificial monuments, the court stated:

> Unfortunately, this case cannot be decided merely by examining the appropriate rules for the interpretation of deeds. The basic premise for the application of these rules is the presence of some ambiguity in the wording of a description and the need to reconstruct a survey as best one can. Without *a real possibility* of varied interpretations, there is no need to consider the order of preference for monuments, etc., for the purpose of such directives is "simply [to] express the truth of common experience as to where error is most likely to occur."

> The Court agrees ... that there is no ambiguity in the 1942 deed, and, hence, there is no need to bottom this opinion on the principles delineated. The terms ... referring to the southeast corner ... are "obviously unambiguous" ....

*Id.* at 147 (citation omitted)(emphasis added); *see also Drolsum v. Horne*, 114 Md.App. 704, 709, 691 A.2d 742, 745 (1997) ("In interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern without the assistance of extrinsic evidence.").

We said in *Ski Roundtop, Inc. v. Wagerman*, 79 Md.App. 357, 364–65, 556 A.2d 1144 (1989):

> [T]he sole controlling focus should be whether the boundaries of the original patents establish the existence of Pleasant View. These patents precede any of the deeds referred to by the Brawners. Any discussion of subsequent deeds is irrelevant.

Then speaking, not of subsequent surveys conflicting with prior deed descriptions, as in the case *sub judice*, but to conflicts between two modern surveys, the Court said:

> Effectuation of the intent of the original parties ... is of paramount consideration in boundary dispute cases.... Determination of which one of the two surveys best effects the true boundaries of the disputed land as intended by the original surveyor [grantor] is a question of fact....
>
> ... Of course, most boundary disputes evolve from surveying mistakes or ambiguous deeds. The fact that one surveyor's interpretation of the original survey results in a tidier or neater package, however, does not suffice, of itself, to override the intent of the original surveyor.

*Id.* at 365–67, 556 A.2d 1144 (footnote omitted) (citations omitted).

In *Marquardt v. Papenfuse*, 92 Md.App. 683, 699, 610 A.2d 325, *cert. denied*, 328 Md. 93, 612 A.2d 1316 (1992), the Court opined that "[t]hus, to the extent that any conflict exists by reason of *course* and distance descriptions, *in the absence of any evidence of contrary intention*, the calls control." (Emphasis added.) In the case *sub judice*, the clear intention of the grantors, as expressed in the Jean Koehn deed, the senior deed, was that the "same" line that had been running in a straight line was to continue in the same straight line to the shore line of Island Creek. The same straight line is a course

to the call of Island Creek. The reference to an old fence line implicated, in the first instance, the fence line that was on the previous "same straight line" and may have continued some forty feet on the continued course. To the extent the phrase "with an old fence line" is used, it is relevant only as to a general description of the area. The intentions of the parties, as manifested in the deed, were that "the same straight line" was to continue to the shore of Island Creek.

The Court stated in *Carroll v. Norwood's Heirs*, 5 H. & J. 155, 163 (Md.1820): [4]

It is the unquestioned right and jurisdiction of the Courts to decide on the construction of grants and deeds, as well as to the description of the land which is to be transferred, ... subject only to the exception of the case of a latent ambiguity.... In construing grants the Courts are to regard, and to be governed by, the intention of the parties, to be collected from the deed ... and nothing extrinsic or *de hors* the deed is to be recurred to for ascertaining such intention, unless in the case of a latent ambiguity. If there is a call ... and course and distance, *and they do not agree*, the call is to be gratified *if it is imperative* or peremptory.... [Emphasis added.]

4 Herbert T. Tiffany, *The Law of Real Property* § 993–94 (3d ed. 1975), as to the fixing of boundaries, states:

In the case of a description by boundaries, as in other cases, the intention of the grantor, as inferred from the terms of the description, is the controlling consideration....

....

... The description in a deed is considered ambiguous and subject to construction *only if it is not possible* to relate the description to the land without inconsistency. [Footnote omitted; emphasis added.]

Similar is 12 Am.Jur.2d *Boundaries, supra*, § 64:

The various rules adopted ... all have for their primary purpose the ascertainment of the intention of the parties.

---

**4.** The case actually involves two opinions, the original and one after a new trial was held. The quotation is from the first appellate opinion.

Another basic consideration is that those particulars of the description which are uncertain and more liable to error and mistake must be governed by those which are more certain; that one should be retained and given efficacy which is the most certain and the least susceptible to mistake. In this regard, a particular is preferred over, and will control or limit, a general description.... [Footnotes omitted.]

In the case *sub judice*, the language "thence continuing in the *same* straight line" is a particular reference to the continuation of the straight line of the previous course. The language "with an old fence line" is, under the circumstances here present, a general reference and therefore is controlled by the more particular.

The proper method of beginning an interpretation of whether a deed is ambiguous is to construe the language of the deed, "thence continuing in the *same* straight line," to mean what it says, *i.e.*, that the straight line that had run for almost 600 feet parallel to and with an old fence line and hedgerow was to continue in the *same* straight line to Island Creek even if the fence and hedgerow angled away in a "different" straight line. Under the circumstances of this case, the call was to the "shore line" of Island Creek. The course was "in the same straight line."

Moreover, to hold as appellant suggests would make the description in the deed potentially ineffective to convey all of the property Jean Koehn was clearly intended to receive in that it would result in the description not completely closing to the stated point of beginning.

It is well settled that, in order to reconcile or make clear the calls of a survey or to more nearly harmonize the quantity of land with that called for in the grant, the calls may be reversed and the lines run in the opposite direction.

*Newbold v. Condon,* 104 Md. 100, 105, 64 A. 356 (1906).

When the disputed line of the plat commissioned by appellant in 1993 by the firm of Rauch, Walls & Lane, Inc., is run in reverse from the shores of Island Creek and limited by the language of the Jean Koehn deed that it of necessity is

subordinate to, appellant's proposed angled line, if it proceeds northeasterly of the point on the southwestern side of the barn road, as shown on the 1961 maps of Kastenhuber, "in the *same* straight line," as required by the language of the deed, would result in the point of beginning of appellant's property as being in the waters of the Cove of Island Creek. This is simply wrong. This map or plat is subordinate to the senior instrument—the Jean Koehn deed. The deed's point of beginning is on the "northwesterly" side of the main driveway at the southern end of a concrete abutment erected over the causeway in said driveway. The point of beginning asserted by appellant using the 1993 plat and, as we have said, reversing the courses in the deed and incorporating the same language, results in a point of beginning approximately forty feet from the point of beginning in the senior deed that the 1993 plat purports to interpret. If the language of the deed, *i.e.*, the intention of the parties in reference to the only deed at issue here, is used to run reverse courses of the 1993 plat, the survey does not end at the point of beginning, *i.e.*, it does not close correctly. Only if other language is used, *i.e.*, "in a *different* straight line," can the reverse run be made to close. A "different" straight line is clearly not what the parties intended.

Even if the deed description was ambiguous, and we hold it is not, "[t]he law fully supports the use of a reverse course to find the actual location of property described in an unclear manner." *Gallas,* 269 F.Supp. at 149–50; see also *Dundalk Holding Co. v. Easter,* 195 Md. 488, 495, 73 A.2d 877 (1950) ("The issue is fundamentally one of fact and the established rules as to preference are simply guides to ascertain the intention of the parties. . . . It is permissible under some circumstances to reverse the lines from the first known boundary. A call may be so indefinite that it must be disregarded.") (Citations omitted.) As is clear, if the language of the Jean Koehn deed is used, *and it must be considered* as it evidences the intentions of the parties, and if a reverse course is run based on the subsequent 1961 Kastenhuber plat and the 1993 Kane plat, the last course ends up in the waters of the Cove of

Island Creek and proper closure is impossible. Moreover, it would also be improper because it would omit a substantial portion of the property contained along and to the southwest of the first course and the waters of the Cove of Island Creek and Island Creek.

In *Hammond v. Ridgely's Lessee,* 5 H. & J. 245, 248 (Md.1821), an action of trespass quare clausum fregit, one of the descriptions at issue stated:

> [L]ying on the west side of the north branch of Patuxent River, beginning at a bounded red oak standing by the said branch, . . . and running [three courses] . . . then bounding on the said river, running S. 5° E. 270 perches, *then by a straight line to the first bounded tree. . . .* [Emphasis added.]

The Court then discussed certain principles of construction as to different legal terms used in describing property:

> The construction of the grant is to be made according to the intention of the parties, to be collected from the words and expressions contained in the grant, if such intention is not inconsistent with some rule or principle of law.
>
> . . . .
>
> So in the case of a call for the head of a creek call Swan Creek, and there are two creeks of that name; and so if there are two places set up as the head of Swan Creek—the jury are to determine in the first case according to the evidence, which creek was intended, and in the second, which place is the head of the creek.
>
> So if a tree is called for, and there are two trees set up as the call; and so if the line of a tract of land is called for, and there are two tracts of that name—the jury are to decide which is the tree intended, and which is the tract of land intended, and at what part of the line the intersection was. *All these are instances of a latent ambiguity, and of locations with a double aspect.*

*Id.* at 254–56 (emphasis added). As we have indicated, we agree with the trial judge that there are no latent ambiguities. Certainly, this case is not even arguably a "double aspect"

case. The *Hammond* Court then discussed the last course of that relevant description:

What is the plain intent and meaning of the parties, to be collected from the words of the grant, "beginning at a bounded red oak standing by the said branch of Patuxent River, and running N. 62° W. 86 ps. to a bounded red oak in a branch, then N. 6° W. 362 ps. to a bounded white oak, then N. 66° E. 120 ps. to a bounded white oak standing by said river, then bounding on the said river, running S. 5° E. 270 ps. then by a straight line to the first bounded tree[ ]?"

*Id.* at 256. It then discussed the nature of the language used in the last course:

The Court [is] of [the] opinion, that the fifth course, "then by a straight line to the first bounded tree," admitted to be the beginning, excludes all doubt, is an imperative call, and must be gratified, and must run from the termination of the fourth line, (the place to be ascertained by the jury,) by a straight line to the beginning, and not with the windings and meanders of the river, but binding on the said straight line.

*Id.* at 257. The Court of Appeals ultimately affirmed the trial court by a 3–3 vote.

Other early Maryland cases support Judge Horne's resolution and our affirmance. One of the cases concerns similar "running with" language that appellant here proffered creates a latent ambiguity. In *Thomas' Lessee v. Godfrey,* 3 G. & J. 142, 149 (Md.1831), a description read in simplified form, from "a bound hickory on the side of a hill, on the south side of the main falls of Patapsco, respecting to the west Chew's Resolution Manor, and running *with the said Manor* ... to a bound hickory." (Emphasis added.) The Court noted:

In this case it is contended, that the expressions, "and running with the said manor," constitute a peremptory call to the tract of land called "Chew's Resolution Manor," and that "The Valley of Owen" must be located to bind on that tract.... But we think they were not used in that sense; and that being associated with a course and distance ... and a further call to a tree, a fixed and natural object, they

are not to be interpreted as importing an imperative, or peremptory call, to run with, and bind upon "Chew's Resolution Manor," but that the tree called for, was intended as the principal object, the boundary to regulate the location of that line.... But here, there is a fixed ulterior object, a tree imperatively called for and designated as the boundary intended to be run to ... explaining and qualifying the expressions "running with the said manor," ... as directory only to the tree called for....

*Id.* at 149–50.

*Wilson v. Inloes,* 6 Gill 121 (Md.1847), involved land patent surveys and resurveys and the descriptions contained therein, in respect to land (and water) in the Fells Point area of Baltimore. The specific issue concerned whether the location of a lost monument could be found by reversing course from a known point (in the water) and running it back to the last monument. The last monument was a missing tree. The tree had been described as being "by the side of a branch." The Court described that call:

[T]he expression as to the branch being merely descriptive of the general locality of the tree, not an imperative call locating the spot where the tree stood. The words "by the side of a branch," thus used, are no identification of a particular spot where the tree must have stood....

The word "by," when descriptively used in a grant as in the case before us, does not mean "in immediate contact with," but "near" to the object to which it relates. And "near," is a relative term, meaning, when used in land patents, very unequal and different distances.

*Id.* at 152–53.

As we have indicated in the case *sub judice,* there was evidence below that the "old fence line" no longer existed and could not, in 1993 or in 1961, be observed on the ground (although it shows on the preliminary Kastenhuber plat). The only evidence below was that the fence line or hedgerow preexisted the partition of the property in January 1961 and

appellees' acquisition of the Western Parcel on January 31, 1962. There was absolutely no evidence in the first instance as to the reason for the erection of the old fence. Whether it was to restrain live stock, partition fields, or to separate tracts of land is unknown. Any attempt to attribute a purpose to the fence that then may no longer have existed, is pure speculation. The reasons for the fence that had at one time existed are lost in antiquity. It is clear, however, *that it was not built for the purpose of delineating the parcel conveyed to Jean Koehn.*

Several states have noted problems with relying on old fence lines and similar features. In *Davis v. Randall,* 322 Mich. 195, 33 N.W.2d 757, 758 (1948), the court, affirming a trial court's finding that an old fence line did not constitute a boundary, said: "We do not find in the record any proof as to which landowner built the fence, whether there was any agreement at that time as to the fence being placed on the true boundary, or any evidence that the fence was ever intended as a line fence to establish a boundary." In *Muench v. Oxley,* 90 Wash.2d 637, 584 P.2d 939 (1978), *overruled in part by Chaplin v. Sanders,* 100 Wash.2d 853, 676 P.2d 431, 436 n. 2 (1984), the court discussed that a surveyor had disregarded the remnants of an old fence at a distance varying from 40 to 100 feet on an angle to the true line. Afterwards, an adjoining landowner claimed "to the old fence." Discussing the doctrine of acquiescence, the court explained that

> recognition by neighboring owners of a fence as the true boundary between their properties and not just as a barrier, is sufficient to establish the fence as the legal line. To prevail, the party claiming must demonstrate agreement or acquiescence ... for the period required to establish adverse possession. The acquiescence must be proved by evidence which is clear, cogent and convincing.

In this case, there simply was no evidence adduced that any of [the persons opposing the person claiming to a fence line] recognized the fence as the true property line.

*Id.,* 584 P.2d at 942 (citations omitted).[5]

Similarly, the court in *Aley v. Hacienda Farms, Inc.,* 584 S.W.2d 126, 128 (Mo.Ct.App.1979), held:

[T]o establish a fence or other markings as an agreed boundary line by long acquiescence, there must be proof of mutual conduct or acts recognizing it as such, and the mere acquiescence in the existence of a fence as a barrier, for convenience or for any reason other than a boundary will not amount to an agreement as to a boundary or establish it as a true line. [Citation omitted.]

*See also Johnson v. Buck,* 7 Cal.App.2d 197, 46 P.2d 771 (1935); *Townsend v. Koukol,* 148 Mont. 1, 416 P.2d 532 (1966); *Hales v. Frakes,* 600 P.2d 556 (Utah 1979).

In Judge Horne's well reasoned assessment of the facts, it is evident that even if he had found the Jean Koehn deed ambiguous, he would have, based upon all of the evidence before him, nevertheless rendered the identical finding as to the present boundary line. He said:

Assuming, *arguendo,* that the boundary line description, which appears in the 1961 deeds ... is ambiguous, the extrinsic evidence does not establish that the original parties—C. Campbell Koehn and Jean Koehn—intended to create an angled partition line. At best, the extrinsic evidence indicates that there was an attempt to redraw the boundary line between the adjoining properties in September of 1961. This effort is evidenced by: the September 21, 1961, survey of the line by Mr. Kastenhuber; a conference, which occurred the next day at "Evergreen Farm," regarding the line; the placement of the concrete monument; and the preparation of the September and October 1961 plats, which depict an angled boundary line.

It is uncertain, however, who set these events in motion. C. Campbell Koehn and Jean Shannihan [sic] (formerly Jean Koehn) might not have wished to shift the partition line. Even if they considered such a change, the timing of

---

5. We mention adverse possession in terms of this appeal, *infra.*

the aforementioned events—more than eight months after "Evergreen Farm" was partitioned—suggests that they did not contemplate an angled partition line in the first instance.

The October 26, 1961, letter from Mr. Bartlett to Plaintiff C. Keating Bowie supports this conclusion. The letter contained the September and October 1961 plats, which show an angled partition line. Mr. Bartlett explained that the September 1961 plat depicts "the new division line that was in question." Notably, he did not indicate that the plat reflects the original [January 1961] boundary line.

Even if the parties to the 1961 deed sought to relocate the partition line, however, the language of the January 31, 1962, deed to Plaintiffs suggests that the efforts of the original parties never came to a fruition. The deed, by which Plaintiffs acquired legal title to the Western Parcel, did not incorporate the survey work that Mr. Kastenhuber conducted in September and October of 1961. The deed also did not refer to either of the unrecorded plats that Mr. Kastenhuber prepared during that period. Consequently, if the Court needed to assess Defendant's extrinsic evidence in order to dispose of this case and believed that the evidence was probative of the intentions of the original parties to the deed of partition, the Court would find that the attempt to alter the boundary line was aborted.

We agree.

Judge Horne found that the January 1961 Jean Koehn deed was not ambiguous. In so finding, he did not err. For the reasons given, we shall affirm.

Because the trial court did not "ignore" the 1961 plats—but properly rejected them—and because it did not ignore any language in the 1961 Jean Koehn deed, but properly construed the language, albeit not in the manner suggested by appellant—we hold that Judge Horne did not err. To the extent we have not fully addressed questions three and four, it is unnecessary to do so in light of our resolution of questions one and two.

No issue was presented on appeal as to appellant's adverse possession contention. It is thus waived and not presented for our review. In any event, had it been properly preserved, we would have affirmed the trial court's findings as to that issue as well.

AREA = 11.985 A

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.